HOWARD E. HALL ET AL. v. ANNA KEITH KOEHLER, ALFRED J. STRYHN and CLAUDIA STRYHN, Appellants.—148 S. W. (2d) 489.

Division One, March 13, 1941.

*Maurice H. Winger, George J. Winger, John T. Barker* and *Frank Brockus* for appellants.

*George K. Brasher* for respondents.

BRADLEY, C.—Action to enjoin violation of restrictions as to use for residence only of property in Hinkle Place addition in Kansas City. Injunctive relief was granted and defendants appealed. There was evidence to the effect, and nothing to the contrary, that if the restrictions were removed the value of the property involved would be enhanced in excess of $10,000, hence the appeal to the Supreme

Court. [Art. 6, Sec. 12, Constitution; Sec. 1914, R. S. 1929, 4 Ann. Stat. 2587.]

The plat of Hinkle Place addition was filed November 12, 1921. The addition consists of 72 lots and extends two blocks north and south and four blocks east and west. Morningside Drive and McGee Street are north and south streets through the addition, and 63rd Street bounds the addition on the south. All the lots except 4 or.5, are developed and improved and all buildings are residences and appurtenances thereto.

Among the restrictions imposed is paragraph one, as follows: "None of the lots in said addition shall be improved, used or occupied for other residence purposes, and no double or duplex houses, hotels, flats or apartment houses, although intended for residence purposes, shall be erected in said addition."

The restrictions were to run for 25 years from September 1, 1921, and an extension of another such period was provided for if desired. Plaintiffs are the owners of some 15 residences in the addition and, for the most part, reside in their respective homes in the addition. Defendant, Koehler, owns lots 44, 45, 46, 56, 57 and part of 58 in the addition, and these lots are the site of the old Hinkle home place, and the large frame dwelling house thereon, fronting south on 63rd Street, is known as the Hinkle house and was there when the addition was laid out. Defendants were tenants of Mrs. Koehler; resided in the Hinkle house and operated therein, under the name of Twin Pine Inn, a kind of an eating place which was licensed as a restaurant.

The defense is estoppel, and that since the plat of Hinkle Place addition was filed, November 12, 1921, business has so developed in the neighborhood as to justify breach of the residence restriction. We shall consider these defenses in the converse.

Defendant Koehler filed separate answer, and as to changed conditions, she alleged:

"That since the execution and filing of said plat the conditions surrounding said property and in the neighborhood thereof have radically changed so that at the time of the filing of this suit, and at the present time, the property surrounding the property owned by this defendant is largely occupied for business purposes, and 63rd Street, upon which the defendant's property fronts, had become a business thoroughfare, extending from Wornall road on the west of said property to the city limits, and highway No. 50 on the east thereof; that said 63rd Street is known and recognized as a business thoroughfare and a heavily travelled trafficway, and that the property on both sides thereof has been zoned by Kansas City for business purposes.

"The property owned by this defendant has a frontage of 165 feet on 63rd Street and is valuable for business purposes and

of little or no value for residence purposes. There is no sale for lots fronting on 63rd Street for residence purposes, and it is difficult, if not impossible, for this defendant to lease her property for strictly residential occupancy.''

Defendant, Mrs. Koehler, purchased the property in November, 1938; the consideration was $20,000, and her deed recited that it was subject to the restrictions. In June, 1939, she leased to the Stryhns, her codefendants, for $100 a month, and on July 9, 1939, the Stryhns started operation of the Twin Pine Inn.

Nine of the plaintiffs testified. Their respective investments in the addition, including lot and improvements thereon, ranged from $8500 to $15,000, and the date of their purchases ranged from shortly after the addition was laid out in 1921 to 1939. Nearly all testified that they would not have purchased property in the addition except for the residence restriction. Typical of all the witnesses, who were interrogated on the subject of property development *in* the addition, is the evidence of Dr. Richard L. Sutton, Jr., who purchased in 1935. He testified:

''The character of the development on either side of my house in the block in which the house is located is solidly residential. They are not fine, high type residences or low type residences; they are nice homes. The one to the east of us is somewhat nicer than. our home, and those to the west are well kept up and seem to be well thought of by their owners . . . The house immediately to the west of me is a residence—a fairly high type residence, somewhat similar to my own; it is a two story house, approximately the same house. . . . That neighborhood is well maintained as a high type or high class, strictly residential neighborhood.''

The evidence on the part of defendants as to business encroachment was about to the same effect as alleged by defendant, Koehler.

The general equitable principles as to restrictions are well stated in 14 Am. Jur., p. 664, sec. 388, as follows:

''Whether injunctive relief will be granted to restrain the violation of building restrictions is a matter within the sound legal discretion of the chancellor, to be determined in the light of all the facts and circumstances. . . . The equitable enforcement of a restriction can be invoked only for the purpose of protecting the benefit which it was the object of the covenant to afford. If the restrictive covenant has ceased to have any beneficial value to the complainant's property, it can form no ground for equitable relief.''

Rombauer et al. v. Compton Heights Christian Church et al., 328 Mo. 1, 40 S. W. (2d) 545, was to enjoin violation of restrictive covenants. In that case it was said [40 S. W. (2d) l. c. 553]:

''No hard and fast rule can be laid down as to when changed conditions have defeated the purpose of restrictions, but it can be safely asserted the changes must be so radical as practically to destroy the

essential objects and purposes of the agreement. Thus an urban tract may be dedicated to residential use under certain restrictions indicating an intention to establish a secluded district for high-class homes. It is inevitable that with the lapse of time, the march of progress, and the shifting and growth of the city, the forces of disintegration will be at work, the houses architecturally and otherwise will become more and more out of date, other residential districts still more pretentious may be laid out, and changes may crowd about, outside. But the parties must be deemed to have anticipated these things and to have intended to combat them as far as possible. And so, if later the necessity of invoking the restrictive covenants arises, the mere fact that, because of changed conditions, the restrictions are less valuable than they once were, will not prevent their enforcement if the district still retains its essential character and the restrictions remain of substantial value.''

The above excerpt from the Rombauer case is, we think, applicable to the present case. It may be that, because of changed conditions, the restriction as to the use of and kind of buildings in the Hinkle Place addition, is less valuable to lot owners in the addition than formerly, but, under the record here, there is no escape from the conclusion that the addition itself ''still retains its essential character (of a residential district) and the restrictions remain of substantial value.''

We find no support for the contention that changed conditions justify violation of the restrictions as to use of buildings in the addition.

Are plaintiffs estopped to complain? Defendant, Koehler, on the defense of estoppel, alleged that ''for a number of years'' prior to the time she acquired the property in the addition, the dwelling thereon ''was used for the purpose of a tea room or eating place,'' and that there was a large sign thereon advertising to the public that the property was being so used; that none of the plaintiffs or their predecessors in title made complaint as to such use, but acquiesced therein; and that by reason thereof ''plaintiffs are now barred by their acquiescence and laches to invoke the aid of equity and obtain injunctive relief against the continuance of the operation of a chicken dinner business in defendant's property.''

She further alleged that prior to the occupancy by defendants, Stryhn, ''she expended large sums of money in rehabilitating and redecorating said property and preparing the same for use;'' that the expenditures ''were made openly and with knowledge thereof on the part of the plaintiffs; that, before the present use of the property, plaintiffs inquired of defendant, or her agent, as to the nature of the proposed use to be made of the said property, and plaintiffs were advised as to the purposes for which the said expenditures were being made, and made no protest in respect thereto, by reason whereof the

plaintiffs have waived their right to object to a continuance of the present use of said property, and are now estopped to enforce the restrictive covenants as to the use of said property.''

The Stryhns, in their answer, allege that they occupy the premises ''as a residence, residing therein with their family; that *incidental* (italics ours) to their occupancy of said premises as a residence they operate therein a chicken dinner and eating place upon the ground floor;'' that they spent large sums of money for furniture and equipment suitable for use in a chicken dinner place; that included in the equipment were ranges and cooking equipment not suitable for residence purposes; that all such equipment was openly purchased, and with knowledge on the part of plaintiffs; ''that prior to the commencement of the operation of the chicken dinner and eating place in said premises and while said expenditures were being made, the plaintiffs, or some of them, inquired of these defendants as to the nature of the use to which they intended to put the premises, and being advised that these defendants intended to use the premises for the purposes aforesaid, plaintiffs made no protest against said use, but stated that they did not want a night club opened or operated in said premises.''

And the Stryhns allege that ''by reason of the facts aforesaid, the plaintiffs have waived their rights to object to a continuance of the present use of said property, and are now estopped to enforce the alleged restrictive covenants as to the use of said property.''

Defendant, Koehler, did not testify, but her agent and manager, John H. Campion, did. He testified that the place ''was just a rundown piece of property, and all we did was to go in there and redecorate the entire house from the basement to the top and fix whatever was needed, fix the interior and painted on the outside and repaired what repairs was needed there and cleaned up the yard and trimmed the trees; . . . papered and decorated the inside of the house especially for the use of this tenant. I could not say exactly how much was spent, but it was $800 or $900. . . . I tried to rent it for a residence. I was not able to do so. I advertised it in the Kansas City Star as business property and I had a big sign out in front. The sign said: 'To Lease for Business.' My name was on the sign and my telephone number. Nobody ever made any objection to me while that sign was up there to leasing this property for business. Nobody living in Hinkle Place ever said a word. The sign was up for five months and I advertised in the Kansas City Star, about five months probably. That was for about four or five months before the Stryhns leased the property. I did not talk to any of the neighbors about leasing this property to Mr. Stryhn at or about the time that the lease was made. None of them ever talked to me about objecting to this use of the property. . . . Someone went out there and

spread the news that there was going to be a night club and, oh, my! I don't know how many people called me up."

Defendant, A. J. Stryhn, testified that "in establishing this for an eating place" he expended in equipment peculiarly adopted for a restaurant or eating house purposes approximately $1500; that he openly moved in the equipment; that he was told (by whom not shown) that the restrictions did not apply to "any building that was already on the territory." He further testified that after he moved in the equipment, he had a conversation with plaintiff Hall, and told him that he had no intention of running a night club, but was going to run an eating establishment, and that Hall said, "If that is the kind of place you are going to run, I won't say one way or the other; I won't object if you go on, but we will see what kind of a place you run." He further testified that they did "not serve sandwiches or anything like that; most of it is reservations; however, from six to eight in the evening people drop in there and order their meals. There are no orders after eight o'clock. We have a radio at the house but we do not have an orchestra."

Jeanette Lamb testified that "about six and one-half years ago" she lived in the Hinkle house for 2 years and 2 months and conducted therein a rooming and eating house; several meals to the public by reservation. "We had a sign out in the front yard. It was about 3 feet wide, and it said, 'The Hearthstone' and 'dinners.' . . . During the time we operated our place which we called 'The Hearthstone' at 100 East 63rd Street, nobody ever made any protest to us about the use of that house for that purpose."

As appears, supra, defendant Koehler alleged that prior to her purchase, the Hinkle house had been used for a tea room or eating house for a number of years, and that none of the plaintiffs or their predecessors complained. The reference is to The Hearthstone, but there was no evidence to support the allegation that there was no complaint. Plaintiffs, Mary J. Ryan, H. B. Wilber, and C. W. Carstens were interrogated on the subject of the alleged prior use, and Miss Ryan testified that she built her house in the addition about 1925; that she did not know Miss Lamb, and did not recall The Hearthstone. Mr. Wilber purchased his lot in 1923. Of The Hearthstone, he said: "I remember The Hearthstone operated by a Miss Lamb, I don't remember just how long ago it was, they were not there very long. The neighbors got to talking about it and were just getting ready to proceed when they folded up and left. They desisted without the necessity of instituting any action." Mr. Carstens purchased about 1925, and of The Hearthstone, he testified: "I remember that somebody ran a rooming house and served meals in this same property in question under the name of The Hearthstone. I saw a sign up there, I believe it was for about two weeks, and then the sign was taken down and these people, as I understand it, went out of business, and

at that time one of my neighbors and myself discussed the idea of proceeding against them for violating the restrictions, but it was unnecessary to do that on account of the people having gone out of business. They abandoned the thing.''

Plaintiff Hall testified that, before The Twin Pine Inn opened, one of his neighbors told him that ''a business was going to open up over there, so I thought it was only fair before he opened up or spent a lot of money, to go over and talk to the gentleman (Mr. Stryhn), so I went across to see him, and he was not there and I told his wife (defendant Claudia Stryhn) that I was going to protest and she informed me at that time it would not do any good to protest, that they were going to open the business and they would see that the business ran there because other people wanted it run and she said, 'Eventually there is going to be a large apartment house built there.' '' Mrs. Stryhn did not testify.

As stated, Mrs. Koehler purchased the property in November, 1938; her deed recited that it was subject to the restrictions; she leased to the Stryhns in June, 1939; The Twin Pine Inn was opened July 9, 1939, and this suit was filed August 23, 1939. It is apparent that Mrs. Koehler proceeded with her eyes wide open; she apparently thought the chance was worth taking and took it. The Stryhns, it would seem, had no actual knowledge of the restrictions prior to leasing. There is no evidence that defendants relied on the fact that The Hearthstone was operated in the house, and certainly such was not sufficient to overturn the residential restriction.

■ ''The law favors the free and untrammeled use of real property. Restrictions in conveyances on the fee are regarded unfavorably, and are therefore strictly construed,'' Mathews Real Estate Co. v. National Printing & Engraving Co., 330 Mo. 190, 48 S. W. (2d) 911, l. c. 913, and cases there cited, but when the intention is clear the courts will enforce such restrictions. [Kenwood Land Co. v. Hancock Inv. Co. et al., 169 Mo. App. 715, l. c. 722, 155 S. W. 861.] As to whether or not the *incidental use,* for business, of a dwelling, the use of which is restricted to dwelling purposes, violates the restriction depends upon the wording of the restriction and the kind of business to which the dwelling is put. [14 Am. Jur., p. 622, sec. 214.] The wording of the restriction here concerned is plain, hence there is no room for argument in that respect.

■ In a note, 43 A. L. R., 1138, it is said: ''Generally, where the covenant forbids the erection of any building except a private dwelling, and the language is such as to indicate that its use must be confined to that of a private dwelling, the courts hold that using it also for business purposes is a violation of the covenant, unless such business is of a minor nature and not habitually carried on, or causes no inconveniences to the neighborhood.'' Quite a number of cases are cited in the A. L. R. note supporting the general rule.

While the law favors the "free and untrammeled use of real property," yet restrictions thereon cannot be and are not to be disregarded. A provision in a trust agreement restricting lots to business or residence purposes, prevents use of the lots for school purposes. [Britton et al. v. School District et al., 328 Mo. 1185, 44 S. W. (2d) 33.] And where use is restricted to school purposes, the property may not be used for residential purposes. [Peters et al. v. Buckner, 288 Mo. 618, 232 S. W. 1024, 17 A. L. R. 543.]

The judgment should be affirmed and it is so ordered. *Hyde* and *Dalton, CC.,* concur.

PER CURIAM:—The foregoing opinion by BRADLEY, C., is adopted as the opinion of the court. All the judges concur.