Hiram L. JONES et al., Appellants,

v.

Maud EILENSTINE et al., Respondents.

No. 23786.

Kansas City Court of Appeals.

Missouri.

June 3, 1963.

Sevier & Turnage, Liberty, for appellants.

Williams, Norton & Pollard, North Kansas City, for respondents.

MAUGHMER, Commissioner.

This is a suit in equity to set aside residential restrictions as to twelve and a fraction lots located in Block 4, Winnetonka Heights, a subdivision in Clay County, Missouri. The numerous defendants are the owners of the rest of the property in the subdivision. The trial court found against plaintiffs and refused to nullify the restrictions. Plaintiffs have appealed.

In August and September, 1940, the then owners of all of the land in Winnetonka Heights signed the use limitations and the same were filed in the office of the recorder of deeds. These restrictive covenants, to run with the land, provided, in part: "Lots 79, 80, 81 and 82 in Block 1, may be used for business purposes and all other lots shall be used only for residential purposes." The residences were restricted to single-family dwellings of one or two stories, were required to contain at least 600 square feet and to cost not less than $2500. The construction of private garages for two cars and chicken houses to accommodate no more than 48 chickens were authorized. Occupancy was restricted to members of the Caucasian race and "noxious or offensive trade or activity" was forbidden. Three property owners, Mr. Phillips, Mr. Horn and Mr. Burns were named as an Enforcement Committee to serve until 1945, when a new committee was to be elected. No election of committeemen has ever been held. One of the original members has moved away. During the early Forties the committee drove by recently constructed homes and inspected them but no building plans were ever submitted in advance. These restrictions were to continue in force until January 1, 1970 and then be automatically extended "unless a majority of the then owners agreed to a change  *  *".

Plaintiffs' acreage, as to which they seek removal of the restrictions, primarily as to the residential building requirements, is in the form of a rectangle. Its boundaries are: A frontage of 277.74 feet on Vivion Road to the north, 150 feet on Elmwood Avenue to the west, Lawn Street on the east, and on the south by two tracts owned by defendants Diels and Mattys.

Plaintiff Jones bought part of this property on December 1, 1954 for $3,750. It contains a residence which Jones occupied

for a few years. It is now rented as a residence. Jones has improved the house and estimates his present cost at $7,500. During 1961, plaintiffs contracted to sell their property to Dr. Marion J. Biondo, an osteopathic physican who, according to the testimony, planned to construct a "medical building" on it. The agreed selling price to Dr. Biondo is $27,500, but the sale is contingent upon the sellers' securing (1) zoning permission from the municipal authorities and (2) removal of any restrictive covenants which would prohibit the contemplated use.

In 1940, Winnetonka Heights was a quiet area only sparsely built up and a likely residential neighborhood. In 1940, Vivion Road was a two-lane highway with little traffic. It has now been widened to four lanes and has become a busy thoroughfare. There has been some business and commercial development along Vivion Road. This development apparently began at its intersection with Antioch Road which is about one and one-half miles west of plaintiffs' property. There the Antioch Shopping Center has been built. These non-residential enterprises have moved eastward along Vivion Road towards plaintiffs' property, and include two churches and a funeral home. One block west of plaintiffs' property is a real estate office housed in a residence. Directly across Vivion Road is the Foxwood Shopping Center containing about 15 stores and offices. Across the road and east from the shopping center is a post office and a service station. There was testimony that on Lots 63, 64, 65, 66, 67 and 68, Winnetonka Heights, there were two-family dwellings which had been there for "six or eight years". Among its other activities the Foxwood Shopping Center contains a drive-in-restaurant. The Blue Valley Savings & Loan building is located on Lots 79 and 80 (which were reserved for business) but its parking lot occupies Lots 73 to 78, which were not reserved for business. The defendant Mattys, whose lot adjoins plaintiffs' on the south, has for some time operated a trash hauling business

therefrom, including the parking and servicing of his trucks.

Qualified realtors, appraisers and loan representatives testified that plaintiffs' property was no longer suitable for residential purposes and that its highest and best use is now commercial. They expressed doubt that builders of residences in this area would be eligible for or could secure FHA or other loans. Defendants offered no expert testimony controverting these expressed conclusions.

During the year 1961, a petition asking that plaintiffs' property zoning be changed from R-1 to C-1, with the exception that "owners agree that a filling station will not be within the meaning of C-1 classification", was filed with the Zoning Board of Kansas City, Missouri. This petition was signed by all of the approximately 200 property owners in Winnetonka Heights except three. The three who did not sign were: defendants Mr. and Mrs. Diels, whose property abuts plaintiffs' on the south, Mr. and Mrs. Phillips (Mr. Phillips was an original board member) and a Mr. Zeller. Two of the signers said they signed only after representations made to them by the plaintiff Jones that all other property owners had signed. On December 22, 1961, the City Council of Kansas City, Missouri passed Ordinance No. 26,845 by which the property involved in this controversy was rezoned from "District R-16, one-family dwellings to District C-1, Neighborhood Retail Business". The City Council passed this rezoning ordinance in spite of the fact that the City Plan Commission had recommended that it be disapproved.

From this evidence the trial court found: (1) "There has been a substantial change and a radical change in the surrounding territory, particularly to the north of Winnetonka Heights"; (2) "There would be a hardship upon the plaintiffs by the enforcement of these particular restrictions"; (3) "The restrictions are of substantial value to the residents of Winnetonka Heights and the court finds that the retention of the

restrictions would be of such benefit" and (4) "That the best use of the land is for other than residential use". Because of its third finding the court denied plaintiffs' petition.

■ This being an equity case we consider it de novo, but giving due deference to the findings of the chancellor. Likens v. Sourk, Mo.App., 263 S.W.2d 462, 463, and Boeving v. Vandover, 240 Mo.App. 117, 218 S.W.2d 175, 177.

■ Broadly speaking, there are two types of actions involving restrictive covenants: (1) Where the owner of restrictive property seeks affirmative relief such as we have here, and (2) Where judicial enforcement of a restriction is sought by way of an injunction against a breach. An analysis of this subject may be found in 4 A.L.R.2d 1111, giving these general conclusions:

"While restrictions in deeds are not favored in law, they will be construed as found, and it is a primary rule that a building restriction will be upheld wherever it remains of substantial benefit to the parties objecting to its violation, provided they are not estopped by their conduct from making such objections. (p. 1114).

\* \* \* \* \* \*

"But despite the tendency of some American courts to adopt a doctrine of comparative benefits, and while a radical change in conditions and in the neighborhood surrounding restricted property will deter practically all American courts from granting injunctive relief, an analysis of the cases as a whole discloses that equity will enforce restrictive covenants imposed for the benefit of the complainant's property, if they remain of substantial value, notwithstanding a resulting hardship to the servient estate, where the complainant comes into court with

clean hands and guiltless of laches, waiver, or estoppel. (pp. 1114–1115).

\* \* \* \* \* \*

"On the theory that only the granting of equitable relief and not the binding force of a restrictive covenant is affected by a change in the character of the neighborhood, the earlier American decisions took the position that changed conditions could be invoked only as a defense to an action to enforce such restrictions by injunction or to enforce a forfeiture and not as grounds for affirmative relief against such restrictions prior to a breach thereof. This earlier view has generally been discarded, particularly since enactment of declaratory judgment statutes or other statutes specifically authorizing actions to settle the existence and validity of any restriction appearing in a chain of title and to clear up doubts and disputes concerning it. (p. 1115).

\* \* \* \* \* \*

"To sum up, courts of equity, in passing upon cases of this character, grant or withhold injunctive relief depending upon the accomplishment of an equitable result in the light of all the circumstances surrounding the particular case, and grant or withhold affirmative relief depending upon whether the restrictive covenant remains of substantial benefit to the dominant estate or whether its purpose has been defeated by a radical change in the character of the neighborhood". (pp. 1115–1116).

The trial court predicated its legal conclusions upon the holding in Rombauer et al. v. Compton Heights Christian Church et al., 328 Mo. 1, 40 S.W.2d 545, 552, 553 (1931). There an injunction restraining erection of a church in an area restricted to residences was sought. The Supreme Court directed issuance of the injunction and stated that the mere fact that the property would bring a higher price, if freed from the restrictions, was insufficient reason to

strike down the restrictions. The court there stated the general rule as follows:

"When, however, the restrictive agreement is induced by the then existing condition and surroundings of the realty in the covenanted area, and assumes its continued availability for particular uses, if a radical change takes place in the whole neighborhood such as defeats the purpose of the restrictions and renders their enforcement inequitable and oppressive, equity will not enforce them, but will leave the complainant to his remedy at law.

\* \* \* \* \* \*

"No hard and fast rule can be laid down as to when changed conditions have defeated the purpose of restrictions, but it can be safely asserted the changes must be so radical as practically to destroy the essential objects and purposes of the agreement. Thus an urban tract may be dedicated to residential use under certain restrictions indicating an intention to establish a secluded district for high-class homes. It is inevitable that with the lapse of time the march of progress and the shifting and growth of the city the forces of disintegration will be at work, the houses architecturally and otherwise will become more and more out of date, other residential districts still more pretentious may be laid out, and changes may crowd about, outside. But the parties must be deemed to have anticipated these things and to have intended to combat them as far as possible. And so, if later the necessity of invoking the restrictive covenants arises, the mere fact that, because of changed conditions, the restrictions are less valuable than they once were, will not prevent their enforcement if the district still retains its essential character and the restrictions remain of substantial value".

Pierce et al. v. St. Louis Union Trust Co. et al., 311 Mo. 262, 278 S.W. 398, 408, was a suit to enjoin violation of restrictive covenants limiting construction in Vandeventer Place, St. Louis, to "First class dwellings". The injunction was granted and approved on appeal. The Supreme Court summarized the factual findings as to neighborhood change as follows:

"But notwithstanding the assaults of commercial business upon the surrounding neighborhood, the evidence as a whole rather tends to show that Vandeventer Place itself has successfully withstood the advance of the commercial army, and has so far maintained its exclusive character as a single family residential district of the highest class. Many families have lived in the addition for more than a generation, and many of the homes have passed into the hands of the second generation. Almost without exception, the plaintiff residents and owners of the 86 lots in the addition testified at the trial that the quiet and seclusive character of the district has been maintained, and bids fair to continue to exist for some time yet to come".

No radical change was apparently shown in this case as to Vandeventer Place itself although the area around it had changed substantially.

A more recent Missouri case is Cowherd Development Co. et al. v. Littick et al., 361 Mo. 1001, 238 S.W.2d 346, 350. This was a suit seeking a declaratory judgment that certain lots in Kansas City, Missouri extension were exempt from building restrictions. Again the court upheld the restrictions. Plaintiff's testimony was that the lots would have a sale value of $100 more per front foot if the restrictions were removed. In ruling that greater value alone would not justify lifting the restrictions, the court quoted with approval from 26 C.J.S. Deeds § 171 c, p. 1179.

"Where a building restriction is designed to preserve property for residential purposes, its violation cannot be excused on the basis of a changed

condition of the surroundings by reason of the fact that it is the opinion of the court that, in a comparatively short time, the premises will be worth more for business than for residential purposes; nor does the mere fact that lots, subject to building restrictions, have become more valuable for business than for residence purposes, as limited by the restrictions, of itself justify equity in annulling the restrictions".

See also Hall et al. v. Koehler et al., 347 Mo. 658, 148 S.W.2d 489.

Plaintiffs invite our attention to cases from foreign jurisdictions where petitioners by equitable action or through declaratory judgments have succeeded in getting similar building restrictions struck down. Those foreign decisions indicate that where there has been a real and radical change in the neighborhood those courts will not only refuse injunctive relief but will affirmatively void the restrictions—in other words, such a change in conditions can serve not only as a shield, but also as a sword.

In Dunlap v. Beaty et al., 239 S.C. 196, 122 S.E.2d 9, 15, which was a declaratory judgment action, the Supreme Court of South Carolina said:

"The earlier decisions rather uniformly held that changed conditions could be invoked only as a defense to an action to enforce a restriction by injunction and not as a ground for affirmative relief against such restriction prior to the breach thereof. The theory underlying this view is that contractual obligations do not disappear as circumstances change. However, the great weight of modern authority is that in an action under the declaratory judgment statute or one to remove cloud on title, affirmative relief may be granted against a restrictive covenant where there is such a change in the character of the neighborhood as to *render the enforcement of the covenant valueless to the covenantee* and *oppressive and unreasonable as to the covenantor*". (Italics supplied).

In that case since the restrictions were made the main street had been widened, traffic had increased and the number of commercial enterprises in the area had multiplied. It was found that continued enforcement of the restrictions on plaintiff's property would result in substantial damage to plaintiff without materially benefitting the defendant. Judgment striking down the restrictions as to residences was entered.

In Anness v. Freeman et al., 294 S.W.2d 77–78, the Court of Appeals of Kentucky approved a decree nullifying restrictions limiting construction to single family dwellings. There was testimony that the property was wholly unsuited for residential purposes. No property owners in the area objected and the Planning and Zoning Commission had approved the change. However, the court again stated the rule in this language:

"It is well established that restrictive covenants against business enterprises will not be enforced when there has been a fundamental change in the character of the property in the restricted area due to municipal expansion, spread of industry and other like causes. See Goodwin Bros. v. Combs Lumber Co., 275 Ky. 114, 120 S.W.2d 1024 and the cases cited therein. However, before a change of conditions *will bring into operation the annullment of a restrictive covenant, it must be a change of such character that it clearly neutralizes the benefits of the restriction to such an extent as to defeat the purpose of the covenant*". (Italics added).

The Supreme Court of California (Key et al. v. McCabe et al., 54 Cal.2d 736, 8 Cal. Rptr. 425, 356 P.2d 169), refused to enforce single family dwelling restrictions by injunction. Here the restrictions were implanted in 1940, prohibited any business, trade or profession, and ran until 1969.

The court found sufficient change because: (1) Fullerton Drive, on which defendant's property fronts is now a 4-lane busy thoroughfare; (2) The property is unsuitable for single-family dwellings; (3) The original scheme has not been carried out. The property within the area and along the highway has been released from the building restrictions by the property owners themselves; (4) The property has been zoned commercial.

Somewhat the same result was reached by the Supreme Court of California in Hess et ux. v. Country Club Park et al., 213 Cal. 613, 2 P.2d 782, but in these two last mentioned cases the trial court's findings were approved on the basis of being supported by substantial evidence.

In Wolff v. Fallon et al., 44 Cal.2d 695, 284 P.2d 802 (Sup.Ct. of Cal., 1955) the restrictions were made in 1913. On a finding of greatly increased traffic on Ocean Highway, the frontage street and that of 19 buildings on the block, 16 were business, the court nullified the restrictions..

Clearly plaintiffs' property in our case is worth more for commercial use than for residential purposes but that is true as to many tracts located in residential areas. Our Missouri courts have ruled that greater commercial value is not alone sufficient cause to nullify the restrictions.

It is also quite apparent, as the trial court found, that substantial changes have occurred since 1940, when the restrictions came into existence. Vivion Road has changed from a two-lane street to a four-lane highway and thoroughfare. Numerous commercial enterprises may be found near the Antioch Shopping Center—one and one-half miles from plaintiffs' property. Such development has moved toward the tract in controversy. The Foxwood Shopping Center with some 15 stores and offices,

is directly across the street. Some small commercial enterprises—Mattys' trash hauling and a real estate office—are at or near plaintiffs' tract. The trial court found radical changes, but also believed that Winnetonka Heights still actually was, in some substantial part at least, and retained the attributes of, a residential area. Certainly not as exclusively residential as it was in 1940, but, nevertheless, residential enough so that removing restrictions as to plaintiffs' tract and constructing a medical building thereon would amount to further damage and would be a further wedge destructive to residential use.

We, too, believe that Winnetonka Heights is still used primarily or at least substantially, for residential purposes and that the restrictions remain of real value to the home owners residing in the subdivision. There was substantial evidence to justify the conclusions of the chancellor. Plaintiffs knew about the restrictions and purchased the property subject to them. Our Missouri courts have been most reluctant to nullify restrictions of this type. And the cases from foreign jurisdictions that do so are instances where the court gave judicial approval and legal sanction to the interment of building restrictions that were actually already dead and no longer operative.

We are unwilling to disturb the lower court's finding and thereby remove forever these building restrictions.

The judgment is affirmed.

SPERRY, C., concurs.

PER CURIAM.

The foregoing opinion of MAUGHMER, C., is adopted as the opinion of the court.

All concur.