Percival C. BARNES, Jr., and Dorothea N. Barnes, Plaintiffs (Respondents),

v.

ANCHOR TEMPLE ASSOCIATION, Defendant (Appellant).

No. 31518.

St. Louis Court of Appeals.

Missouri.

July 16, 1963.

Motion for Rehearing or for Transfer to Supreme Court Denied Sept. 4, 1963.

Harry C. Avery, Ralph V. Wilson, St. Louis, for defendant-appellant.

Lashly, Lashly & Miller, William E. Rulon, St. Louis, for plaintiffs-respondents.

John J. Morris, City Counselor for City of University City, University City, as amicus curiae.

JACK P. PRITCHARD, Special Judge.

Plaintiffs filed this suit May 5, 1961, asking for a permanent injunction against defendant, Anchor Temple Association, from building and constructing a parking lot, and using and occupying therefor property adjoining plaintiffs' residential property in University Heights, a subdivision of St. Louis County, Missouri, alleged to be in violation of certain building and use restrictions as hereinafter set forth. Trial was had on June 22, 1961, which resulted in a decree of injunction against defendant from using the property as a parking area

for automobiles, from which decree defendant appeals, after having filed motion for judgment or in the alternative for new trial, which were overruled.

The appeal in this case was first lodged in the Supreme Court of Missouri, but that court, holding that no constitutional question was preserved by defendant, ordered the case transferred to this court on January 21, 1963.

Although respondents have filed a brief herein, they did not participate in the oral arguments had on March 6, 1963, but at that time their former counsel informed the court that respondents had disposed of their property since the decree below.

The motion of the City of University City, Missouri, for leave to file brief as Amicus Curiae, and motion to intervene, were granted by the trial court.

Plaintiffs, after alleging and setting forth descriptions of the adjoining properties owned by the parties (Lot 19 in Block 5 of University Heights Subdivision owned by plaintiffs, and Lot 20 in Block 5 of University Heights Subdivision as owned by defendant) further alleged that on February 23, 1904, the University Heights Realty and Development Company caused to be subdivided into lots by a plat recorded in Volume 6 of Plats, pages 14 and 15, in the Office of the Recorder of Deeds for St. Louis County, Missouri, certain lands then owned by it into the subdivision named "University Heights" which includes the properties owned at this time by the parties. Along with said plat were restrictions set out in a Declaration of Trust and Agreement, recorded in Book 161, page 37, of the records of said Recorder of Deeds, providing, insofar as is pertinent now, as follows:

"ARTICLE II

"The Company agrees and covenants that neither it nor its successors or assigns will or shall any of them have power to convey, demise or otherwise dispose of any of the said lots or any part thereof, except expressly subject to the conditions, restrictions and easements in these presents set forth and defined, and that every conveyance by said Company, or its successors or assigns of any of said lots or parts thereof shall expressly refer to this declaration of trust and agreement, and by such reference or otherwise make the provisions hereof a part of such conveyance.

"The burden of, and the obligation to observe and perform the covenants, restrictions, conditions and easements herein expressed in respect of each lot, shall run with the land and shall bind the owner or owners of such lot into whomsoever hands it may come, and the corresponding benefit, and the right to compel the observance of such covenants, restrictions, conditions and easements in respect to such lots, shall run with the title to all others of said lots, and enure to the benefit of the owners thereof from time to time, and such right may be enforced by the owner of any of such lots, by appropriate proceedings at law or in equity. * * *

"ARTICLE III

"Section 1. No building other than a private dwelling house, and the stable and outbuildings appurtenant thereto, shall be erected on any of said lots, nor shall any lot or part thereof be used or occupied for any but private residence purposes, * * *. This declaration of trust and agreement has been executed, and is made a part of the public records, for the express purpose of inducing persons, in consideration of the benefits hereby conferred, to purchase the said lots in University Heights, and is hereby made irrevocable and binding upon said Company, and upon said property and every lot and part thereof, in favor of the purchaser or purchasers of any of said lots of University

Heights, as laid down on said plat, and their heirs and assigns. * * *"

Defendant admitted by answer the above allegations and the further matters alleged by plaintiffs that it purchased Lot 20 on or about January 29, 1952, by deed which contained by reference the identical restrictions and conditions as above set forth, and it also admitted that it is building a parking lot.

So far as is material to this appeal, defendant denied plaintiffs' allegations as follows: that its property is not a "private residence" or a "building appurtenant thereto" within the meaning of said restrictions and conditions, or that the use or occupancy of said Lot 20 as a parking lot is not for private residence purposes. Defendant further denied plaintiffs' allegations that they will suffer irreparable damage if the defendant is permitted to construct and maintain said parking lot or use it for parking lot purposes; that their property will be depreciated in value thereby; that they will be subjected to constant noise and noxious odors caused by the ingress and egress of automotive vehicles and that the desirability of plaintiffs' property for use for residence purposes will be substantially reduced and diminished.

Further answering, defendant alleged that since the restrictions contained in the Declaration of Trust and Agreement, the whole neighborhood covered by same has so changed that it is no longer, and at the times herein complained of, was no longer an exclusive residential neighborhood; that in close proximity thereto was erected an apartment house, a Masonic Temple, three Jewish Synagogues and two churches; and that Delmar Boulevard, upon which plaintiffs' and defendants' properties front, is no longer a residential street, but is a main thoroughfare that today is burdened with the heaviest traffic in University City, especially bus and commercial motor vehicular traffic; that the restrictions are, accordingly, no longer valid or applicable; and the large congestion of automobiles and commercial vehicles on Delmar Boulevard and along the curbs of property abutting Delmar Boulevard, make it desirable for the owners thereof to provide off street parking on their respective properties for their individual use and that of their guests; and that to restrain defendant from using a portion of its property for private parking purposes would impose great hardship on it and yield no benefit to plaintiffs whatsoever.

Defendant also alleged that the Declaration of Trust was on July 5, 1923, amended by court decree so as to permit the erection of a Masonic Temple on Lot 22 and the West 44 feet of Lot 1 in Block 5 of University Heights Subdivision, which temple was erected on said property, and by the acquisition of said lots all of said lots became limited and restricted for use as a single lot or parcel of ground in connection with the Masonic Temple as an appurtenance thereto, all of which benefitted the neighborhood in question and the property of plaintiffs in particular.

The evidence adduced reveals that plaintiffs, residing at 6925 Delmar Boulevard, have six children, three of whom are now residing at home with their parents. The Barnes purchased their property, Lot 19 in Block 5, of University Heights Subdivision, in 1946, paying $12,500 therefor. On April 2, 1961, the Barnes returned from a trip to Florida, and upon seeing a bulldozer in Lot 20, just east of their lot, made inquiries, and Mr. Barnes attended a conference with defendant's members. He learned that defendant intended to construct and use a parking lot on Lot 20, purchased by it in January, 1952, for use in connection with its building located farther east on Lots 21 and 22, and the West 44 feet of Lot 1, all in said Block 5. At this meeting the question of defendant purchasing plaintiffs' house came up, and Mr. Barnes quoted a price of $45,000 for it. Lot 20 had been a tennis court which had been built and used by plaintiffs' predecessor in title. Upon the tennis court some part of the backstop, one of the net posts

and part of the clay court were remaining in part, although the court was fading out.

The original Declaration of Trust, setting up the residential restrictions on the properties here involved, was made January 19, 1905. On July 5, 1923, pursuant to provisions of the Declaration, Article III, Section 6, as follows:

"It is further agreed that if, at any time after January 1, 1910, a majority of the owners of lots in University Heights (estimated by the frontage of said lots and also by the assessed value of said lots) shall agree that further limitations and restrictions on the use of said lots in University Heights are desirable to maintain said tract as a first-class residence quarter, said majority of lot owners may petition the Circuit Court of said locality for a decree that such further limitations and restrictions be imposed as though recited herein, and if the said court upon due hearing (after such notice to all other lot owners as may be practicable) shall adjudge that said limitations prayed are reasonable and just, then it is hereby authorized by decree to make the same a part of the terms of this instrument upon the due record of said decree in the office of the Recorder of Deeds of said locality."

The Circuit Court of St. Louis County by order amended the original Declaration to add thereto the following:

"Lot 22 and the West 44 feet of Lot 1, all in Block 5 of University Heights, are hereby limited for use as a single lot or parcel of ground for the erection of a Masonic Temple."

On January 6, 1936, a Pro Forma Decree of Incorporation was granted the Temple Association, defendant herein.

The area surrounding plaintiffs' residence, a fourteen room house, is all residential on the north side of Delmar Boulevard, excepting defendant's building. The City Hall, a school, a police and fire department and a library, all existing and lying east of plaintiffs' property in University Heights Subdivision, were reserved for such use by the original Declaration. To the south, across Delmar directly from the proposed parking lot, is a building originally erected as a private home, now being used by a Synagogue as a type of school, and to the east of the Synagogue school is the Synagogue itself. Almost directly across, south from the Anchor Temple, is a Greek Orthodox Church. Defendant's committee offered to landscape the parking lot to make it as least objectionable to plaintiffs as possible. Plaintiffs did not directly ask anyone to join them in this suit, but talked to two persons about the parking lot, Mr. Hennessee, who lives directly behind the parking lot, and Mr. Weishaar, who lives directly behind the Temple. Mr. Weishaar, one of the trustees for University Heights Subdivision, told Mr. Barnes that he was in favor of the parking lot because it would remove some of the parking from in front of his home.

Traffic conditions on Delmar Boulevard are heavy. In ten years the increase has been from around 10,000 to around 27,900 vehicles in a 24 hour period. On some evenings the traffic problem around the Temple is quite acute and at times it is not possible to find parking facilities close to the Temple, there being something going on there generally five nights a week. There has been a chaotic condition of parking along Delmar in front of Anchor Temple, and across the street in front of City Hall for a number of years due to the intensive use of the land, although City Hall has a parking lot immediately behind the Fire Department, which is on Harvard Avenue.

Witness Napolilli, Assistant Director of Public Works for University City, testified that in his opinion the off street parking around defendant's property would be beneficial. Witness Jensen, Building Commissioner for University City, testified it is the policy of the City to require off street park-

ing on new buildings, from dwellings on up. Mr. Rippstein, member of defendant's lodge, drew the plans (Defendant's Exhibit H) for the parking lot, and submitted them to University City, and a permit therefor was issued. The use the parking lot is to be put is to provide parking facilities for the occupants or attendants at Anchor Temple, and not for any public use. Plans were made to screen the lot and decorate it with shrubbery, and this was discussed with Mr. Barnes at the time of the meeting with him.

Defendant first says that the trial court erred in failing and refusing to find the parking lot was not prohibited by the restrictive covenant and was not mentioned in the restrictions. The court further erred, defendant says, by reading into the restrictions a prohibition of the parking lot where none existed, and by extending and enlarging the restrictions by implication to prohibit the use of said parking lot.

■■ Many cases in Missouri, and those cited by defendant, set forth the general principle of law that, " * * * Restrictive covenants will not be extended by implication to include anything not clearly expressed in them, and if there is substantial doubt of their meaning, such doubt should be resolved in favor of the free use of the property. * * * " Chiles v. Fuchs, 363 Mo. 114, 249 S.W.2d 454, 456(4–5); Mathews Real Estate Co. v. National Printing & Engraving Co., 330 Mo. 190, 48 S.W.2d 911, 913(2–4), 81 A.L.R. 1039; Rombauer v. Compton Heights Christian Church, 328 Mo. 1, 40 S.W.2d 545, 555(21, 22); Marks v. Bettendorf's, Inc., Mo.App., 337 S.W.2d 585, 590(6–8).

■ Of course the words "parking lot" were not mentioned in this 1905 instrument, for as defendant suggests, these were the horse and buggy days, and parking lots as we know them today would not have been contemplated by the developers of this residential subdivision. But the words of the declaration are clear enough: "No building other than a private dwelling house, and the stable and outbuildings appurtenant thereto, shall be erected on said lots, *nor shall any lot or part thereof be used or occupied for any but private residence purposes.*" (Emphasis added.)

We can see no ambiguity in the quoted words of the restriction as would admit to any construction other than to give effect to their plain meaning, that is, that the use or occupancy of the lots in question be *only* for residential purposes, and this would be clearly to the exclusion of all other purposes. Porter v. Johnson, 232 Mo.App. 1150, 115 S.W.2d 529, 533(11, 12), where the court said: " * * * The rules governing construction of restrictive agreements are the same general rules to be followed in construing any contract or covenant. Strauss v. J. C. Nichols Land Company, 327 Mo. 205, loc. cit. 213, 37 S.W.2d 505. The prime rule of construction is that when there is no ambiguity in the language used, then there is no room for construction. The plain every day meaning of the language of the contract governs. * * * " See also Marks v. Bettendorf's, Inc., Mo. App., 337 S.W.2d 585, 590(6–8). Thus it is apparent that the trial court did not read into the restrictions a prohibition against the parking lot where none existed, and did not extend and enlarge the restrictions (beyond their plain meaning) by implication as contended by defendant.

■ Under its Point II, defendant urges that even if the restrictions could be enlarged and extended to include the parking lot, the term "stable" as used in the restrictions of 1905 could be construed to mean the same thing as a garage and parking area today. Defendant cites two cases from other jurisdictions in support of this argument. That of Smith v. O'Brien, 46 Misc. 325, 94 N.Y.S. 673, 674, states, "The *garage* is the modern substitute of the ancient livery stable, and it was always the common law that the livery stable keeper had no lien, because the owner had and exercised the right of use of the horse kept, and so the continuous possession was de-

stroyed." The court in the case of Diocese of Trenton v. Toman, 74 N.J.Eq. 702, 70 A. 606, 611, stated: "These *garages* occupy, with relation to automobiles, the same place that stables do with regard to horses, and stables have not been held to be nuisances." (Emphasis supplied to the excerpts from both cases, neither of which involved restrictive agreements.) Neither of these cases hold that the word *stable* is today analogous to the words *parking lots or areas* as used in connection with a building such as the defendant's Temple, assuming that it has acquired the attributes of a private residence by the court decree of 1923 amending the Declaration of Trust and Agreement to permit the erection of a Masonic Temple.

■ It is indeed common knowledge today that private residences do not ordinarily have stables, and that the extensive use of automobiles has occasioned home owners to provide garages, driveways and "pads" before such garages, for use in the keeping of their vehicles in off street facilities. But such fact would not permit the conclusion that defendant could use the entirety of Lot 20 of Block 5 for the parking of some 44 automobiles (according to the engineer's drawing, Defendant's Exhibit H) on the theory that the word "stable" may logically be construed to mean "parking lot or area." In this connection, we note further from the provisions of the Declaration of Trust and Agreement, Article III, Section 4, in evidence, that, "No stable, shed or other outbuilding shall be constructed or maintained upon any of the lots in said University Heights nearer to the line of any public or private street upon which said lot abuts, than two-thirds (2–3) of the distance between the line of such street and the opposite side of said lot." Thus, although neither party has raised the point, this restriction would militate against the proposition that a "stable" (acknowledging that it is a modern garage) can now become a parking lot or area occupying the whole of Lot 20. Thus, defendant's Point II is ruled against it.

■ Defendant next presents, under its Point III, its argument that the restrictions should not be enforced because they, or a portion of them (relating to stables and like appurtenances) had ceased to be effective by reason of lapse of time and changed conditions. As to the time factor urged, defendant cites Gardner v. Maffitt, 335 Mo. 959, 74 S.W.2d 604, 95 A.L.R. 452. That case involved the construction of a 25 year restriction on the property conveyed that " * * * 'the conveyance hereby made is subject to these reservations, easements, restrictions, covenants and conditions, that shall remain in full force and effect for twenty-five years,' * * *." The first conveyance was made in 1895. Plaintiff in this 1934 suit (more than 25 years after the restriction was imposed) sought to remove the cloud of a building line restriction contained in his 1907 deed which referenced the 1895 plat containing the restriction, the applicable part being, " * * * and no building, or any part or portion thereof, shall, *at any time* be erected or placed between said building line and said street." (Emphasis supplied.) The court held that the previous words of the restrictions above set forth were controlling, saying, " * * * The duration of 25 years fixed in the provision immediately preceding this complete recital of the restrictions imposed applies grammatically and logically to each of them. * * *" The court did say there (Gardner v. Maffitt, 335 Mo. 959, 74 S.W.2d 607): " * * * Where the time during which a restrictive covenant is to endure has not been expressly limited by the parties, it should be implied that some limitation was intended and that it was such as the nature of the case would indicate as reasonable. * * *" See also Duncan v. Academy of Sisters of the Sacred Heart at St. Joseph, Mo., Mo., 350 S.W.2d 814, 819. The last mentioned quotation is the one upon which defendant relies. We believe and hold that the facts here of the Declaration of Trust and Agreement creating a *perpetual* property right or easement (for the benefit of the covenantees) in each

of the successive owners of the properties within University Heights Subdivision, that the same be used for residential purposes only, distinguishes the case at bar from the rule announced in the Gardner and Duncan cases, supra. This is true for the further reason that the restrictive instrument here is clear as to the intention to protect this residential neighborhood, the restrictions are reasonable to this area, and they are certainly not against public policy. 26 C. J.S. Deeds § 162(3), p. 1088; 26 C.J.S. Deeds § 170, p. 1170.

■ The evidence in this case is that this subdivision as originally platted and developed remains wholly residential within its area with the exception of defendant's building. It is a well cared for area, according to the testimony and photographs in evidence, with the nicer type of expensive large homes, albeit that some of them are many years old. The fact that the traffic on Delmar Boulevard past this area has heavily increased over the years would not destroy the residential character of this subdivision, nor would the fact that some of the surrounding territory had changed destroy the restrictions. Cowherd Development Co. v. Littick, 361 Mo. 1001, 238 S.W. 2d 346; Proetz v. Central District of C. & M. Alliance, Mo.App., 191 S.W.2d 273; Hickey v. Greengard, Mo.App., 176 S.W.2d 661, 665; Hall v. Koehler, 347 Mo. 658, 148 S.W.2d 489; Rombauer v. Compton Heights Christian Church, 328 Mo. 1, 40 S.W.2d 545, 553. Under this evidence and the law of the foregoing cases, we must reject defendant's contention that the restrictions here are no longer valid because of changed conditions. So long as University Heights Subdivision retains its essential residential character which it now has, without deterioration or impairment of value for residential uses, the restrictions against other than that use will remain valid and enforceable.

■ There is some evidence here that the permitting of the parking lot would be beneficial to the neighborhood and to various residence owners by removing the street parking of those who use defendant's facility from in front of their residences. And it may be inferred that by reason of the heavy traffic along Delmar Boulevard that a traffic safety problem would be alleviated somewhat. The trial court recognized the necessity for relieving congestion in the area which would benefit the municipality, and also the need for a parking area by defendant. Yet, a balancing of the inconveniences or hardships of the parties cannot be done in this case where there is no evidence of change of conditions within the restricted area in which both parties are subject to a valid, enforceable restrictive agreement. Rombauer v. Compton Heights Christian Church, supra. Plaintiffs (or their successors in title) may insist upon enforcement of their covenants, and may not, under the facts and circumstances of this case, be forced to reside next to a busy parking lot, filled to capacity with 44 automobiles on as many as five nights per week, with resultant noise and fumes, and interference with the peaceable enjoyment of their property, the very thing these restrictions were designed to prevent.

■ The cases cited in plaintiffs' brief, hereinafter listed, are controlling on the question of whether the use or occupancy here proposed by defendant is prohibited by the Declaration of Trust and Agreement. In Rombauer v. Compton Heights Christian Church, supra, 40 S.W. 2d 545, 552(6), it was stated: "The general rule is that equity will enjoin the violation of restrictive covenants, irrespective of the amount of damage which would result from a breach, and even though there be no substantial monetary damage. The covenantee may stand upon his contract and the law will enforce it. (Citing authorities.)"

The reasons for this general rule are more fully developed in the case of State ex rel. Britton v. Mulloy, 332 Mo. 1107, 61 S.W.2d 741, 743(1–3), as follows:

"The plaintiffs in the injunction suit (relators here) are owners of lots in

University Heights subdivision. The defendant school district was proceeding to erect and use buildings and grounds in such subdivision for school purposes in violation of valid building restrictions excluding and prohibiting such use. It is the settled law of this state that where the deeds of conveyance impose valid restrictions on the lots within a given area, then each lot and the owner of same has an easement in each and all the other lots affected by the restrictions, which easement is a property right to be protected by injunction, at the owner's instance, restraining and preventing violations of the building restrictions. * * *"

See also Bub v. McFarland, Mo.App., 196 S.W. 373; Scallet v. Stock, 363 Mo. 721, 253 S.W.2d 143; Cowherd Development Co. v. Littick, 361 Mo. 1001, 238 S.W. 2d 346; and Proetz v. Central District of C. & M. Alliance, Mo.App., 191 S.W.2d 273.

■ In defendant's Point V, it sets forth that the finding and decree of the trial court is erroneous in that it enjoins defendant from using the proposed parking lot while at the same time permitting defendant to construct the same. While we can see no practical merit in this contention (for if defendant cannot, by reason of the injunction, *use* the area for parking purposes, it would be useless to construct it) we think that for purposes of clarity the decree below should be amended to prohibit also the construction of the lot, as pleaded and prayed for by plaintiffs, and the construction of which was admitted by defendant.

■ Defendant, by its Point VI, complains that the court erred in that the Declaration of Trust and Agreement (Plaintiff's Exhibit E, page 7) relates only to the type of building to be erected, or to the use to which it can be put. There is no merit in this argument, because as above set forth, these restrictions are clear: "Nor shall any lot or part thereof be *used* or *occupied* for any but private residence purposes."

It is ordered that this case be remanded to the trial court for amendment of the decree enjoining defendant also from constructing the parking lot in question, otherwise the decree is affirmed.

WOLFE, Acting P. J., and ANDERSON, J., concur.