A. P. CAMPBELL and Bonnie Lou Campbell, his wife, Leonard H. McFadden and Virginia L. McFadden, his wife, and William Faye Thomason and Esther Mabel Thomason, his wife, Plaintiffs-Appellants,

v.

Geraldine STOUT and Register R. Byrd, Defendants-Respondents.

No. 8494.

Springfield Court of Appeals.

Missouri.

Nov. 4, 1966.

Dalton, Treasure & Bullard, Kennett, for plaintiffs-appellants.

McHaney, Billings & Welman, Kennett, for defendants-respondents.

HOGAN, Judge.

This is an action to enforce building restrictions on a lot located in Kennett, Missouri. The trial court sustained defendants' motion for summary judgment, and the plaintiffs have appealed.

The case is before us on the pleadings, affidavits and exhibits filed; there are no depositions or formal admissions in the transcript. The factual background of the case, gathered from the pleadings, affidavits and exhibits, is as follows: In May 1956, defendant Stout laid out and platted a tract known as Barbara Heights Subdivision to the City of Kennett. The regularity of the dedication is not questioned, and it is unnecessary to describe the layout of the subdivision in detail. Generally, the plat shows that the subdivision consists of ten lots, laid out from north to south on either side of a central street, which is a cul-de-sac. The central street is open on the south, where it intersects a public highway which runs diagonally in a north-easterly-southwesterly direction along the south side of the subdivision, so that Lot 10, the southernmost lot on the west side of the central street, and Lot 6, which is opposite Lot 10 on the east side, are right triangles, with each hypotenuse abutting the highway. Lot 6 is considerably larger than the other lots and adjoins a motel on the northeast. The words of dedication on the plat include the following paragraph:

"Easements are hereby granted unto the City of Kennett for the benefit of all owners in said subdivision of 10-foot strips of land in width at such points and locations in said subdivision as the City may select and designate by proper survey and plat for the purpose of placing therein, thereon and thereunder, and the maintaining of the same, such necessary poles, wires, pipes, conduits and other equipment for furnishing electricity, heat, light, water, power, gas, or any other public convenience desirable for a residential district; provided, however, the center line of such easements shall conform to the division lot lines and center lines of streets as shown on the plat of said subdivision, and provided the exercise of the rights thereunder does not interfere with any building or improvement located on the subject property, giving to the City of Kennett full rights of ingress and egress for said purposes."

After the subdivision was laid out, Mrs. Stout built her own home on Lot 1. In February 1957, Mrs. Stout executed a contract with Mr. Byrd giving him the option to purchase Lots 3, 5, 8, 9, and 10 in the subdivision, and in March 1957 she executed another, similar agreement concerning Lots 2 and 4. Neither of these two contracts referred to any building restriction. However, at various times between February 12 and August 19, 1957, Mrs. Stout conveyed all the lots in the subdivision, except her own and Lot 6, to Mr. Byrd by warranty deed, and in each of these conveyances (there were five) there was inserted the following covenant, immediately after the description:

"Subject to the following restrictions: The Party of the second part, his heirs and assigns agree not to erect upon said premises any buildings designed or intended to be used for any purpose or purposes except as a private residence and any said residence shall meet and comply with existing minimum FHA requirements. This provision shall not be construed to apply to out buildings for domestic purposes to be used in connection with the residence."

Lot 6 was purchased by Mr. Byrd under a somewhat different arrangement. On May 2, 1962, Mrs. Stout and Mr. Byrd executed a lease agreement upon this property, by the terms of which Lot 6 was demised to Mr. Byrd for a period of eight years at an annual rental of $500.00. By this instrument, Mr. Byrd is given an option to purchase the realty at any time during the

term upon thirty days' notice. It was agreed that upon exercising the option, Mr. Byrd might deposit the purchase price with a designated escrow agent and receive a warranty deed. It is not clear when the deed to Lot 6 was delivered to Mr. Byrd, but apparently Mrs. Stout executed a conveyance to him covering Lot 6 at the time the lease was executed; in any event, the deed was filed for record May 22, 1965. Neither the lease nor the deed involving Lot 6 contains any restrictive covenant.

Eleven residences have been built in the subdivision, all by Mr. Byrd. Each conforms to the restriction which we have set out, and there is no space for further construction in the subdivision except on Lot 6. The chain of title from Mrs. Stout to Mr. Byrd to the present plaintiffs is not quite complete upon the record, but the plaintiffs have alleged and offered to prove that the covenant mentioned was incorporated either expressly or by reference in all the deeds to all the purchasers to whom Mr. Byrd sold houses. One of the plaintiffs has made an affidavit that defendant Byrd represented to him that the subdivision was restricted. Defendant Byrd, immediately prior to the institution of this action, was engaged in the construction of a medical office building on Lot 6. Other facts and evidentiary detail will be noticed in the course of the opinion.

■■ First, though the parties have not and do not raise the question, we must examine our jurisdiction of the appeal. Taney County v. Addington, Mo.App., 296 S.W.2d 129 [1]. As framed, the plaintiffs' action was for an injunction against the construction, or for a declaratory judgment that there were valid building restrictions prohibiting it. There was no prayer for a money judgment, and of course the sole issue presented was the validity of the restriction or restrictions. Eilers v. Alewel, Mo., 393 S.W.2d 584, 586 [1]. But even though these cases do not involve the title to real estate in the appellate jurisdictional sense, and even though there was no prayer

for monetary relief, jurisdiction of the appeal might be vested in the Supreme Court by reason of the amount in dispute, if the money value of the relief to the plaintiff, or of the loss to the defendant, should the relief be granted, or vice versa should the relief be denied, exceeds $15,000.00. Section 477.040, RSMo. (1959), V.A.M.S.; Eilers v. Alewel, supra, 393 S.W.2d at 586 [1]; Fleming v. Moore Brothers Realty Co., 363 Mo. 305, 308, 251 S.W.2d 8, 10. A concomitant to this "vice versa" rule is that the record must affirmatively show the value of such relief or loss to be in excess of $15,000.00, independent of all contingencies, and the court may not indulge in speculation or conjecture to determine the amount in dispute for jurisdictional purposes. Dunbar v. Board of Zoning Adjustment, Mo., 380 S.W.2d 442, 445 [2, 3]; Barnes v. Anchor Temple Ass'n., Mo., 369 S.W.2d 192, 193–194 [1–3]; Long v. Norwood Hills Corp., Mo., 360 S.W.2d 593, 596–597. The plaintiffs' single allegation or statement concerning the money value of the relief sought, should it be granted or denied, is found in an affidavit made by one of the plaintiffs which contains the statement that defendant Byrd told him the proposed construction would depreciate the value of the individual plaintiffs' homes. We may not therefore estimate the value of the relief sought to the plaintiffs in terms of an increase or decrease in the value of their property. However, the plaintiffs' petition alleged that "either defendant Geraldine Stout or defendant Register R. Byrd are erecting . . . a clinic for four doctors." One of defendant Byrd's affidavits was that the planned construction would cost in excess of $40,000.00. One of the plaintiffs' counter-affidavits contained a statement that the building permit issued by the City of Kennett to Byrd looked to the construction of a clinic for four doctors at a cost of $24,500.00. The plaintiffs represented in another affidavit that only a part of the foundation and a part of the plumbing work had been completed, and further represented that defendant Byrd had stated, "I'm cer-

tainly glad you stopped me when you did so I didn't get more money involved in this project."

Superficially, it might appear that this appeal involves a sum of money beyond our jurisdiction, particularly if we measure the loss of profit to the defendant should the relief be granted or denied by the value of the building Byrd planned to construct. By that measure he is either granted or denied the right to improve Lot 6 with a building ostensibly worth $24,500.00 or $40,000.00, either of which sums would remove the cause from our jurisdiction. Nevertheless, the requirement of an affirmative showing, and the prohibition against speculation and conjecture in determining the amount in dispute, require, in our view, more positive and definite proof of the ultimate benefit or damage to the defendant than is shown upon this record. The plaintiffs do not contend for a single-residence restriction; the possible ultimate value of all of Lot 6 used for residential purposes is not contrasted or compared to the contemplated use, as was the case in Veal v. City of St. Louis, 365 Mo. 836, 839, 289 S.W.2d 7, 9 [1], nor is there evidence that defendant Byrd stood to lose a large sum invested in partial construction, or that he had obligated himself in a sum beyond our jurisdiction, as was true in Fleming v. Moore Brothers Realty Co., supra, 363 Mo. 305, 251 S.W.2d 8. Admitting to some hesitation, we conclude that we have jurisdiction of this appeal.

■ Returning to the merits, we again note that the appeal is taken from the entry of a summary judgment. The record must therefore be viewed in a light most favorable to the plaintiffs, against whom judgment was entered. Cooper v. Finke, Mo., 376 S.W.2d 225, 228–229 [2]. If we consider the plaintiffs' affidavits as showing what competent testimony is available, 3 Barron & Holtzoff, Federal Practice and Procedure, Section 1236, p. 82 (Supp.1965), and consider the face of the writings received by the trial court, the record in essence shows: (1) That a common grantor, Mrs. Stout, filed a plat of the subdivision in which she granted easements for electricity, heat, lights, power, gas, "or any other public convenience desirable for a residential district"; (2) that in conveying all but one lot in the subdivision, the common grantor inserted a restrictive covenant by the terms of which the grantees and their heirs agreed not to construct any building for any purpose " * * * except as a private residence"; (3) that eleven houses, all conforming to the restriction mentioned, have been built in the subdivision and there is no building space left except on Lot 6; (4) that defendant Byrd built all the houses, and at one time or another held title to all the restricted lots; (5) that defendant Byrd made a statement capable of construction as a present representation of fact to one of the plaintiffs that use of all the land was restricted to residential purposes. The plaintiffs' position is that a covenant, servitude or negative easement, as one chooses to call it, restricting the use of Lot 6 to residential purposes should be inferred from the language of the plat and the insertion of restrictive covenants in the deeds to all the property except Lots 1 and 6, or alternatively that such a restriction can and should be inferred as a matter of equity from the writings considered together with the defendants' course of conduct in developing the subdivision. The defendants remind us that restrictions upon the use of real property are not favored in Missouri, that instruments creating such restrictions are strictly construed and are not to be extended by implication to include anything not clearly expressed, and point to the fact that nothing in the writings presented to the trial court imports any obligation on the part of the common grantor to restrict the use of Lot 6.

■ There is considerable force to the defendants' argument, particularly on the face of the documents involved. It has been repeatedly stated that restrictions upon the use of land must either be expressly

stated or most clearly inferable from a writing, Chiles v. Fuchs, 363 Mo. 114, 118–119, 249 S.W.2d 454, 456–457 [2] [4, 5]; Zinn v. Sidler, 268 Mo. 680, 688–689, 187 S.W. 1172, 1174, L.R.A.1917A 455, and any ambiguity must be resolved in favor of free use of the property. Steve Vogli & Co. v. Lane, Mo., 405 S.W. 2d 885, 889 [4–6]; Barnes v. Anchor Temple Ass'n., Mo.App., 369 S.W.2d 893, 898 [1, 2]. Manifestly, it would do violence to these precedents to expand the phrase "or any other public convenience desirable for a residential district" into a restrictive covenant, and likewise, if we have regard for the form of the covenants contained in the deeds to Lots 2, 3, 4, 5, 7, 8, 9 and 10, the obligations are all the grantees'; nothing apparent on the face of these deeds obligates the grantor to restrict Lot 6 in favor of the plaintiffs. Kuhn v. Saum, 316 Mo. 805, 810, 291 S.W. 104, 105–106 [2].

On the other hand, there is a strong line of current general authority which supports plaintiffs' basic legal theory that when a common grantor develops a tract of land for sale pursuant to a general plan or scheme of improvement, and sells a substantial number of lots subject to restrictions of benefit to the land retained, then the grantees acquire an equitable right, variously called a reciprocal negative easement or implied reciprocal servitude, to enforce a similar restriction against the purchaser of the unrestricted lots who has actual or constructive notice of the restrictions.[1] These cases generally hold, in varying language, that the intent to make such restrictions mutual and binding may be inferred from the subdivider's sale of his tract pursuant to a uniform plan or scheme,[2] although, as the defendants point out, the precedents are not uniform and cannot be fully harmonized or reconciled. The principle that unrestricted lots may become subject to such a negative easement or implied reciprocal servitude by reason of having been sold pursuant to a general scheme of improvement has been recognized in this jurisdiction, Kuhn v. Saum, supra, 316 Mo. at 810–811, 291 S.W. at 106, and see Scurlock, Missouri Law of Land Agreements which Run with the Fee, 23 U.Kan.City L.Rev. 3, 47–49, although we agree with the respondents that one cannot say the doctrine applied in Michigan was fully adopted in that case.

■ It would serve no useful purpose, however, to enter upon an abstract discussion of the law as it might be applied if we could extrapolate record facts sufficient to resolve the merits of this case. Though the case involves matters of considerable financial importance, and the law involved is certainly complex, the whole of the forty-one page transcript before us, omitting pleadings and formal matters, consists of seven affidavits, with three exhibits. Three of these affidavits were made by Mr. Byrd, and one of them is "explanatory" of another. The basic question before us, after all, is whether a summary judgment should have been entered, and we conclude that the case should not have been disposed of in that fashion. Upon an incomplete research, we have the tentative view that the kind of implied restriction for which the plaintiffs contend is actually raised and enforced upon very elementary principles of equity, though the

---

1. Grange v. Korff, 248 Iowa 118, 79 N.W. 2d 743, 747–748 [3] [6]; Rieger v. Wessel, Ky., 319 S.W.2d 855, 857–858 [2–4]; Turner v. Brocato, 206 Md. 336, 111 A. 2d 855, 864–865 [16]; Sanborn v. McLean, 233 Mich. 227, 206 N.W. 496, 497 [1–5], 60 A.L.R. 1212, 1214–1215; Minner v. City of Lynchburg, 204 Va. 180, 129 S.E.2d 673, 678–679 [2, 3] [4]; 2 American Law of Property, § 9.33, pp. 430–432 (1952); Annos., 4 A.L.R.2d 1364 (1949); 144 A.L.R. 916 (1943); 60 A.L.R. 1216 (1929).

2. Turner v. Brocato, supra, 206 Md. 336, 111 A.2d at 865; Cook v. Bandeen, 356 Mich. 328, 96 N.W.2d 743, 747 [8]; Minner v. City of Lynchburg, supra, 204 Va. 180, 129 S.E.2d at 679; 20 Am.Jur.2d Covenants, Conditions and Restrictions, Sections 173 and 175, pp. 732–735, 736–738.

language used is that of traditional property law. Cook v. Bandeen, supra, 356 Mich. 328, 96 N.W.2d at 747–748 [9]; Johnson v. Mt. Baker Park Presbyterian Church, 113 Wash. 458, 194 Pac. 536, 538–540 [3]. Generally it may be said that the question whether restrictions were imposed pursuant to a general scheme or plan of improvement is to be determined by the intention of the parties, as gathered from the words used in the light of all the facts and circumstances, 26 C.J.S. Deeds § 167 (2), pp. 1147–1151, and we are inclined to agree with the observation made in Hagan v. Sabal Palms, Inc., Fla.App., 186 So.2d 302, 314–315 [19] [20], in a somewhat similar situation, to the effect that the law concerning these implied restrictions appears complex precisely because the result in each case involves a balancing of the equities, which must be determined from the facts. The scanty record before us indicates support for the positions of both parties, but no testimony of any kind has been heard, and because in any such case there are many subjective factual considerations involved which could conceivably be decisive one way or the other, we think the final result can only be fairly arrived at after a trial on the merits. The summary judgment procedure is not a substitute for a trial on the merits, Cooper v. Finke, supra, 376 S.W.2d at 229 [4], and in our view the plaintiffs should have been permitted to develop the relevant facts and circumstances. It is so ordered.

STONE, P. J., concurs.

TITUS, J., not participating, because not a member of the court when this case was submitted.