Mr. and Mrs. Richard A. WEBER,
Plaintiffs-Appellants,

v.

LES PETITE ACADEMIES et al.,
Defendants-Respondents.

No. 36738.

Missouri Court of Appeals,
St. Louis District,
Division Three.

Jan. 20, 1976.

Motion for Rehearing or Transfer
Denied Feb. 26, 1976.

Application to Transfer Denied
April 14, 1976.

Donald S. Hilleary, Clayton, for plaintiffs-appellants.

Ziercher, Hocker, Tzinberg, Human & Michenfelder, Robert C. Jones, Clayton, for defendants-respondents.

McMILLIAN, Judge.

This is an appeal by plaintiffs, from a judgment denying an injunction to force the removal of a nonresidential structure from a subdivision which plaintiffs contend is restricted solely to single family homes. This case was previously before us after the circuit court sustained defendants' separate motions for summary judgment. *Weber v. Les Petite Academies, Inc.*, 490 S.W.2d 278 (Mo.App.1973). We then affirmed that the written subdivision restrictions on the recorded plat do not, as a matter of law, restrict the lot in question to residences. However, we reversed and remanded for a trial on the merits of the second count: whether the common grantor's plan of development created a negative easement, a reciprocal servitude, enforceable by plaintiffs. That trial has been held, resulting in a judgment for defendants. We affirm.

The plaintiffs, Mr. and Mrs. Richard Weber, are the owners of a single-family home on Lot 37 located in Marietta Plat 3, near the intersection of New Halls Ferry Road and Highway 140 in St. Louis County. Defendant Les Petite Academies, Inc., is the owner of Lot A, at the intersection of Marietta Drive and New Halls Ferry Road, immediately adjacent to Lot 37. At the time the original suit was filed, defendant National Homes Construction Corporation was erecting a structure on Lot A to be used as a day nursery by Les Petite Academies.

Marietta Plat 3 was developed by a common grantor, one Richard J. O'Brien, owner of the land and the construction company, who had the tract surveyed and subdivided in 1960. A map of the plat was filed for record by the Recorder of Deeds on August 4, 1960. The map contains the following written "Subdivision Restrictions":

"All dwellings to consist of a minimum of 80% masonry exterior facing.

"Any addition to present home must be attached to same—not a separate dwelling.

"Each dwelling must have a minimum living area of 1,150 square feet, plus a two (2) car attached garage.

"Only chain link type fencing may be used. Fencing may be installed only in the *back* yard of each lot, *not* on *sides* or *front* of dwelling."

These are the only written, recorded restrictions; the deeds to the lots in Plat 3 contain no restrictions but recite that they are subject to "restrictions of record." Plat 3 is a segment of Marietta Drive originating at New Halls Ferry Road. Plat 3 contains lots numbered 37 through 49 and 52 through 57, lettered Lots A and B. In its entirety, Marietta Subdivision contains 163 numbered lots but only three lettered lots—A, B, and C. Lot C is a large corner lot in Plat 4 with a swimming pool, which is maintained for subdivision residents.

Having seen a newspaper advertisement, on September 24, 1961, Mr. Weber and his then-fiancée went to the subdivision where they talked with Mr. O'Brien and Mr. Reinhardt, his salesman. At that time, fifteen of the lots in Plat 3 had completed, occupied residences. Plaintiffs were given copies of advertising brochures which described the subdivision as, among other things, "a Development of Luxurious New Homes" and an "Attractive controlled neighborhood." These showed Marietta Subdivision as extending all the way to New Halls Ferry Road; that is, as encompassing Lots A and B. The sales contract in which plaintiffs agreed to purchase their "residence" from O'Brien stated that it was to be "one of a number of residences" being built in Plat 3 by O'Brien.

Mr. O'Brien testified that, at the time of planning Marietta Subdivision, he had attempted unsuccessfully to have Lots A and B rezoned to commercial. However, when plaintiffs purchased their home in 1961, the zoning ordinances of St. Louis County excluded private pre-kindergarten and nursery schools. On April 13, 1965, a new zoning ordinance permitting a day nursery became effective. On June 1, 1971, Les Petite Academies was issued a permit to construct a day nursery.

Les Petite Academies purchased Lot A from Mr. O'Brien on May 28, 1971, approximately nine (9) years after residences had

been built on all the numbered lots in Plat 3. In this intervening period, New Halls Ferry Road had been widened and traffic along it had increased greatly. Also there is some indication in the record that commercial establishments were being built across New Halls Ferry Road from the subdivision.

National Homes Construction Corporation began construction in July, 1971. On July 19, 1971, a member of the Marietta Improvement Association notified an attorney (later plaintiff's counsel) of the structure being erected on Lot A, and the attorney went to the site and delivered a letter to a party who promptly mailed it to National Homes. On that same day, he sent a telegram to National Homes and letters to both defendants, requesting that the parties cease and desist from further construction. Construction continued to completion.

The nursery has been in operation since 1971. It is open twelve (12) hours per day. At the time of trial, it had a staff of eleven and had enrolled eighty-seven children (100 children are allowed by its license). Children are being dropped off or picked up continuously all day, creating traffic. These cars park in front of the homes on Marietta Drive. When there are cars parked on both sides of the street, two cars cannot pass. Also, trucks make deliveries to the nursery. Once or twice a month the nursery holds night activities, drawing approximately fifty (50) cars. Plaintiffs expressed the opinion that the added congestion caused by the nursery had inconvenienced them and diminished the value of their home.[1]

Plaintiffs seek a decree ordering the nursery to cease its operation. The legal theory upon which plaintiffs rely was described thusly in the controlling case of *Campbell v. Stout*, 408 S.W.2d 585, 589 (Mo.App.1966):

"[W]hen a common grantor develops a tract of land for sale pursuant to a general plan or scheme of improvement, and sells a substantial number of lots subject to restrictions of benefit to the land retained,[2] then the grantees acquire an equitable right, variously called a reciprocal negative easement or implied reciprocal servitude, to enforce a similar restriction against the purchaser of the unrestricted lots who has actual or constructive notice of the restrictions. . . ."

In ruling against plaintiffs, the trial court made findings of fact, including *inter alia* the following: the use of a portion of Lot A for a day nursery was consistent with "an attractively controlled neighborhood." O'Brien had not intended for Lot A to be used as single-family residential; Les Petite Academies had no actual or constructive notice of any scheme of development that would restrict Lot A to single-family residential use; and the equities favored the use of Lot A for a day nursery rather than a single-family residence. Therefore, the court concluded that there was no negative reciprocal easement restricting the use of Lot A to single-family residential.

On appeal plaintiffs have three main contentions: (1) they assert that the court erred in rejecting as hearsay statements of O'Brien which were relevant and material to his plan for Marietta Plat 3; (2) they assert that the above findings of fact were contrary to the weight of the evidence; and (3) they assert that the court erred in holding that the nursery was not in violation of any negative reciprocal easement. We agree with plaintiffs' first contention.

Over objection and by offer of proof, plaintiffs offered their own testimony and that of two other residents of Plat 3 concerning conversations they had with O'Brien regarding Lots A and B. Plaintiffs

---

1. Diminution in the value of plaintiffs' property is not a prerequisite to their equitable right to enforce the restriction which they contend exists. See *Matthews v. First Christian Church of St. Louis*, 355 Mo. 627, 197 S.W.2d 617, 619 (1946).

2. Here, the alleged restriction is for the benefit of the whole tract rather than just the land

retained. This factual difference might affect who could enforce the restriction. See generally *Kuhn v. Saum*, 316 Mo. 805, 291 S.W. 104 (1926); Annot., 51 A.L.R.3d 556. Otherwise, the essential elements of the doctrine are correctly stated and applicable.

testified that O'Brien told them in 1961 that Lots A and B were each two lots and that he might sell half of Lot A to a doctor or lawyer to work out of his home, which would conform to the restrictions on plaintiffs' home. Mrs Weber testified that she was told that the lot next to hers would be residential. Several times between 1961 and the mid-sixties Mr. Weber spoke to Mr. O'Brien about purchasing a portion of Lot A to build a home for his wife's parents, but his offers were always rejected by O'Brien. According to Mr. Weber, O'Brien told him on one occasion that the lot was taken, on another that it was too expensive, and on still another occasion that no one would be interested in being so close to New Halls Ferry Road. Mr. Olheide, the first resident of Marietta Plat 3, inquired of Mr. O'Brien in July, 1960, as to the proposed use of Lots A and B. He testified that Mr. O'Brien said these lots were to be used to make a park. Likewise, prior to June 1961, when she and her husband purchased Lot 51, Mrs. Mary L. Clinton, asked Mr. O'Brien what his intentions were regarding Lots A and B. She was allegedly told that Lot A was two full separate lots and Lot B was two full separate lots and that these lots were to be planted in bluegrass to make a nice park-like entrance. O'Brien testified and indicated that he did not recall the specific conversations in which he is alleged to have discussed his intentions regarding Lots A and B. However, he denied having ever told anyone that Lots A and B were intended for residential purposes.

■ The above testimony was clearly hearsay. The trial court, however, erred in refusing to admit and consider it, but under the circumstances herein, we hold the error to be harmless. A well-established exception to the hearsay rule allows proof of plan or design by the speaker's own statements as to its existence. *Mattan v. Hoover*, 350 Mo. 506, 166 S.W.2d 557 (1942); *Wilcox v. Coons*, 362 Mo. 381, 241 S.W.2d 907 (1951); *Lewis v. Lowe & Campbell Athletic Goods Co.*, 247 S.W.2d 800 (Mo.1952) and Wigmore on Evidence, 3rd Ed., Vol. VI, § 1725 at p. 79. These conversations were competent as within the exception. They related to a present existing state of mind and do not appear to have been made under suspicious circumstances.

■ Plaintiffs' second main contention requires that we review the trial court's findings of fact, especially those on intent and notice, the two requisites for creating a negative reciprocal easement. In a court-tried case, we review the cause de novo both upon the law and the evidence but we must give due deference to the opportunity of the trial court to judge the credibility of the witnesses. Rule 73.01(3), V.A.M.R., and *Pope v. Pope*, 520 S.W.2d 634, 636 (Mo.App. 1975). However, while the trial judge is entitled to deference by an appellate court, his findings lose weight when he excludes competent evidence which is relevant and material to the issues. *Brooks v. Brooks*, 208 S.W.2d 279 (Mo.1948).

■ The critical time in determining whether a common grantor intended to impose a general plan of development is at the time the subdivision was platted and lots were first sold. *Rieger v. Wessel*, 319 S.W.2d 855, 857 (Ky.1958). A party seeking enforcement of restrictions on use of lots in a residential development may show such intention by inference and no ground of valid inference may be disregarded; but rather inference appearing with sufficient clearness from any source should be accepted. *Turner v. Brocato*, 206 Md. 336, 111 A.2d 855, 863 (1955). Since O'Brien's intent at the time of the excluded conversations is highly relevant to the issue of whether he had a plan to restrict Lot A to residential use, we have considered this testimony in reaching our decision. See *Mattan v. Hoover*, supra, at 567. We note that these conversations would have been sufficient for a finding that O'Brien had intended a general plan which would have restricted the subdivision to residential use. However, it is unnecessary for us to decide which way the evidence preponderates, because we hold that, even if O'Brien intended such a general plan, Les Petite Academies did not have actual or constructive notice of the restrictions. Therefore, any

resulting negative reciprocal easement would not have been enforceable against them.

■ The law favors the free and unrestricted use of property. So, although reasonable restrictions on the use of property are valid, any ambiguities will be resolved so as to avoid such restrictions. *Vogli & Co. v. Lane*, 405 S.W.2d 885 (Mo. 1966); *Pellegrini v. Fournie*, 501 S.W.2d 564 (Mo.App.1973) and *Cash v. Catholic Diocese of Kansas City—St. Joseph*, 414 S.W.2d 346 (Mo.App.1967). Further, there is the even more fundamental rule that effect will be given to the parties ascertained intention wherever possible. *Turner v. Brocato*, supra, at 864. Accordingly, equity will not step in and impose an implied restriction unless a negative covenant was clearly understood by all the parties. *Macloon v. Vitagraph*, 30 F.2d 634 (2d Cir. 1929) and *Saari v. Silvers*, 319 Mich. 591, 30 N.W.2d 286 (1948). Therefore, a negative restrictive covenant may be enforced against a purchaser only if he purchased with notice of the restriction.[3] In equity, notice sufficient to charge a purchaser with knowledge of restrictions imposed as a part of a general plan may be either actual or constructive, including knowledge of facts which ought to have put him on inquiry. Annotation, 4 A.L.R.2d 1371; *Campbell v. Stout*, supra. Once such notice is established the purchaser will not be permitted to violate the restriction—but a purchaser without notice takes free of the restriction.

■ Building restrictions on a recorded plat are constructive notice to subsequent purchasers. *King v. St. Louis Union Trust Co.*, 226 Mo. 351, 126 S.W. 415 (1910) and 20 Am.Jur.2d, Covenants, § 311. Plat 3 has restrictions which refer to "homes," "dwellings," "living area," and "back yard." In the prior appeal, *Weber v. Les Petite Academies, Inc.*, supra, at 282, we said,

" . . . All these restrictions, at least arguably, tend to indicate that the subdivision is to be limited to residential dwellings. . . . " However, there we were referring to the intent issue, not to the notice issue. The "Subdivision Restrictions" on the plat are, by their terms, standards of construction. Defendants are in literal compliance with those standards. In accord with the policy favoring free use of land, we will not interpret restrictions on construction so as to create restrictions on use. Cf. *Bernard v. Winkley*, 130 S.W.2d 196, 197 (Mo.App.1939) (Plat may establish a building line restriction but only if it does so by express language.). Therefore, the recorded plat which is silent, or at best ambiguous, on the subject of use, did not give defendants constructive notice that the area was restricted to residential.

■ Plaintiff argues that actual notice may have arisen from the brochures and advertising, from the letters and telegrams sent by plaintiffs' attorney, and from the actual appearance of the subdivision. The former two are easily disposed of— newspaper advertisements and literature provided by the grantor to prospective purchasers certainly can create notice of restrictions on the property. *Hofmann v. Hofmann*, 172 Misc. 378, 14 N.Y.S.2d 565 (1939) and *Hegna v. Peters*, 199 Iowa 259, 201 N.W. 803 (1925). But that rationale is inapplicable here since the advertisements and brochures were published at least ten (10) years before defendant purchased the property and there is no indication that defendant ever saw them. The letters and telegrams were equally ineffective because they were communicated not only after the purchase but even after construction had begun. Obviously, the critical time for determining whether there was notice sufficient to burden a purchaser with restric-

---

3. See generally 20 Am.Jur.2d, Covenants, § 304.

Though using different terminology and emphasis, the Restatement (Second) of Property, § 539 (1944) reaches the same result:

"The equitable interest resulting solely from the enforceability in equity of a promise re-

specting the use of land is effective against the successors in title or possession of the promisor except as they are entitled to the protection of the recording acts or of the defense of bona fide purchaser for value."

tions on the land is the time of purchase. Otherwise, the notice requirement would be meaningless. The whole purpose of the requirement is to prevent some concealed intent from altering or diminishing the grantee's ownership rights in the land. The absence of restrictive covenants certainly entered into the consideration paid. On the other hand, defendants had seen the subdivision prior to purchasing Lot A.

"The uniform appearance of a particular tract, and the nature of the buildings thereon, has been considered in several instances as sufficient to charge a purchaser of a lot in the tract with notice of a general plan of restrictions, or at least sufficient to put him on inquiry as to whether there was a general plan." (Annotation, 4 A.L.R.2d 1364, 1371)

Whether the appearance of Marietta Subdivision was such as to bring it within that rule is a question of fact. The trial court specifically found that defendants did not have "actual knowledge . . . of any uniform scheme of development of all lots in Marietta, Plat 3" and such finding is supported by the record. Even granting that the pre-existing structures on Marietta Drive in Plat 3 were all residential and were all similar in design, defendants could reasonably have believed that Lot A was not a part of any uniform scheme of development. Lot A was not among the residences but isolated at the end of the street. It was not numbered but lettered, and the only other lettered lot contained not a residence but a swimming pool. It was not of uniform shape and size but significantly larger.

Therefore, defendants were not in violation of any negative reciprocal easement. However, in reaching this conclusion we do not adopt all of the findings of the trial court. Specifically, we do not find that a balancing of the equities either favors or disfavors the use of Lot A as a day nursery. Such a finding is not necessary to the decision of this case. Nor does our finding of a lack of any restriction to residential use apply to any lot in Plat 3 other than the lot in question. But while we do not agree with certain of the trial court's findings, in

our opinion the conclusion of the trial court has adequate support in the record and thus, we affirm.

Judgment affirmed.

SIMEONE, P. J., and GUNN, J., concur.