Allen ASHELFORD et al.,
Plaintiffs-Respondents,

v.

William J. BALTRUSAITIS et
al., Defendants,

and

Terry W. Flood, Defendant-Appellant.

No. KCD30441.

Missouri Court of Appeals,
Western District.

May 5, 1980.

Motion for Rehearing and/or Transfer to
Supreme Court Denied June 9, 1980.

C. Brooks Wood, Hillix, Brewer, Hoff-haus & Whittaker, Kansas City, for defend-ant-appellant.

Douglas B. Eskridge, Feldhausen & Esk-ridge, Kansas City, for plaintiffs-respon-dents.

Before WASSERSTROM, C. J., and WELBORN and SMITH, Special Judges.

WASSERSTROM, Chief Judge.

Plaintiffs are members of the Home Owner's Association of Green Acre Estates, a residential subdivision located in an unin-corporated area of Platte County, Missouri. They instituted this litigation to restrain an alleged violation by defendants Mr. and Mrs. William Baltrusaitis and Terry W.

Flood of the Declaration of Restrictions governing this subdivision. The trial court granted a permanent injunction from which defendant Flood appeals. We reverse.

Green Acre Estates was originally solely owned by Mr. and Mrs. John T. Schott and Mr. and Mrs. Fred H. Monteil. Those parties executed and on October 23, 1967, placed of record a Declaration of Restrictions. The portions of direct pertinency to the present case are paragraphs VII and XVI, which provided as follows:

"VII. APPROVAL OF PLANS

No building, fence, wall or other structure shall be commended [sic], erected or maintained, nor shall any addition thereto or change or alterations therein be made, until plans and specifications, color scheme, plot plan and grading plan therefor, or other information satisfactory to the parties shall have been submitted to and approved in writing by the parties and a copy thereof as finally approved lodged with the parties. In so passing upon such plans, specifications, and other requirements, the parties may take into consideration the suitability of the proposed building or other structure and the materials of which it is to be built, to the site upon which it is proposed to erect same, the harmony thereof with the surroundings and the effect of the building or other structure as planned on the outlook from adjacent or neighboring property.

\* \* \* \* \* \*

"XVI. PARTIES RIGHT TO ASSIGN

The parties, by appropriate instrument, may assign or convey to any person, organization or corporation any or all of the rights, reservations, easements and privileges herein reserved by the parties and upon such assignment or conveyance being made, its assigns or grantees may, at their option, exercise, transfer or assign such rights, reservations, easements and privileges, or any one or more of them, at any time or times, in the same way and manner as though directly reserved by them or it in this instrument."

During the initial years following 1967, Mr. Schott and Mr. Monteil made all the decisions and exercised all approval authority. In about 1976, Monteil retired and the Monteils sold their interests to Mr. and Mrs. James D. Miller. Thereafter for a period of about a year all matters pertaining to the approvals were handled by Schott on behalf of himself and his wife and as agent for Miller and his wife. Then, about the middle of 1977, Schott decided to proceed with the organization of a homeowners association, to which he intended to transfer the right to make decisions affecting the subdivision. However, that intention on the part of Schott was never carried into effect by the execution of an "appropriate instrument" which would comply with the provision of Paragraph XVI of the Declaration.

The Baltrusaitises became interested in Green Acre Estates as a home site in March 1978, and enlisted the assistance of Mrs. Levada Clevenger, a real estate agent for Paris Realty. Clevenger showed them lots available for purchase and advised them that any home to be erected would have to be given advance approval.

After some consideration, the Baltrusaitises decided upon Lot 8. When they spoke to Clevenger about proceeding with the purchase, she asked them for plans which she could submit along with a short form real estate contract for signature by the seller. Mr. Baltrusaitis advised her that they did not yet have any formal plans, but that they could supply her with a "miniplan," which they did. This mini-plan consisted of a piece of promotional material which had been prepared by a company which offered "modular homes" (by which is meant large sections were prefabricated off-site), which the Baltrusaitises intended to purchase and have installed on Lot 8 by Flood.

Paris Realty had handled a number of sales of lots in Green Acre Estates and in every instance had dealt with Schott as the person who was in a position to grant approval. Accordingly, in the present instance, Clevenger took the contract proposal along with Exhibit B to Schott. He

looked over the plan and commented, according to Clevenger, "that it was a beautiful house and that the lot would be just perfect for it . . . He agreed with me that it was a pretty house." Schott's recollection about what was said in the course of this conversation on March 15, 1978, was equivocal, but he did testify that he "did nothing to reject the concept of the house" and that "based on the way it looks at the outside, with a set of the plans being presented, I would say, just looking at it from the outset, fine, no problem." At the conclusion of this short meeting, Schott called Miller and advised him that it was satisfactory for him to sign the contract which Clevenger was to bring to him.[1]

The purchase of the lot then proceeded rapidly to consummation. The Baltrusaitises entered into a contract with Flood for the construction of the modular house on Lot 8 at a total cost to them of $56,600, and Flood proceeded to place his order with Mark V Homes for the modular prefabricated construction at a cost to him of $35,871.

On or shortly before June 27, 1978, Mark V Homes delivered the first section of the modular home to Platte County where it was hauled to Lot 8. The physical presence of that section served as the first notice to the members of the Home Owner's Association or anyone in its behalf that the Baltrusaitises intended to erect a modular home. As soon as that became apparent, Mr. Phillip C. Reed, President of the Association, telephoned both Clevenger and Baltrusaitis to state that the consent of the Home Owner's Association was necessary for such erection and that the submission of building plans would be required.

Reed also called a meeting of the Association's executive board, which was held at Reed's home on June 29, 1978. The minutes of that meeting show that Reed advised the board that the only parties who could disapprove any plan submitted by the Baltrusaitises were the Schotts and the Monteils, and that this should be changed by the Schotts and Monteils executing an assignment of the approval power to the Association's executive board. It was agreed to meet with Schott regarding such an assignment, and it was also decided to set a meeting with the defendants and an attorney, Mr. Eskridge, who was to be retained by the Association.

A meeting did take place at the office of the Association's attorney on Saturday, July 1, between the officers of the Association, its attorney Mr. Eskridge, Flood and Mr. Baltrusaitis. At that meeting, Flood presented a photograph, Exhibit G, representing what the proposed house would look like when completed, and he also presented a set of detailed plans which by that time was in his possession. Flood and Baltrusaitis explained that the proposed house would have some variances from what was shown on Exhibits B and G, consisting primarily of the fact that certain brick work shown as facing the foundation on one side and in the front would be omitted, a small porch shown as overhanging the front door would be omitted, there would be a gable rather than a hip roof, and that there would be a slight difference in decorating detail under the front windows by the substitution of cedar beams instead of fencing. The committee voiced no opinion with respect to the proposed plans, but said that the plans would be presented to the Home Owner's Association for approval over the weekend and that Baltrusaitis would be notified on Monday of the decision.

---

1. Before the mini-plan, Exhibit B, was presented to Clevenger, Flood had snipped off the bottom portion, which bore the name and insignia of the manufacturer, World Homes, Inc. Flood testified that he cut off this portion because World Homes was not going to supply the house which he proposed to buy for Lot 8, but rather he intended to purchase from Mark V Homes, who would duplicate the plans shown on Exhibit B. Plaintiffs' brief implies that defendants misled Schott by cutting off the portion of this exhibit which would have disclosed the prefabricated nature of the proposed house. But defendants' failure to advise Schott in this regard is immaterial because of Schott's testimony that the proposed home would have been acceptable to him if it had strictly complied with Exhibit B, even after he had learned that Exhibit B represented a prefabricated structure.

A meeting of the Home Owner's Association was held on Sunday, July 2, 1978, and Reed reported with respect to the July 1st meeting. This meeting was attended by approximately 35 people who discussed the Baltrusaitises' plans and then voted unanimously to disapprove. Schott, who attended the meeting, testified that "different people voted against the Baltrusaitis' construction of this house for a variety of reasons," some of which were "personal" reasons. The fact that the building came in sections and looked "trailor [sic] like" disturbed the homeowners and made them "a little emotional about the appearance." Schott further testified that the people in attendance "were kind of scared by the appearance of this one section  .  .  . that and the fact that they did not know anything about it. It was a shock." Reed also testified concerning that meeting and stated "different people voiced different opinions about the home  .  .  . They didn't care for the trailer-like appearance."

The next day, July 3, 1978, Eskridge sent formal written notice to defendants of the result of the July 2 meeting. The only reason given in the letter was: "The 35 homeowners felt the proposed plans and specifications failed to comply with paragraph VII of the Subdivision Restrictions." The letter went on to direct defendants to remove the section of the home presently located on the lot by July 6, in default of which the letter threatened litigation.

Both before and again immediately after receiving the letter of July 3, Baltrusaitis called Reed asking for specific reasons why his plans had been rejected. Reed testified that in response to this request: "The only reason I told him, was that we didn't feel like it was the quality of the homes in the neighborhood, and we would submit a letter with further reasons."

The deadline of July 6 came and went without any capitulation on the part of defendants. To the contrary, their building activity continued with the pouring of the foundation taking place on July 5. Another meeting of the Home Owner's Association was held on July 10. A general discussion ensued with respect to what should be done. The minutes of the meetings show that one possible course of action discussed was: "We can make cosmetic changes or keep out the manufactured home because it does not conform." The final decision of the meeting was to file a court suit for a temporary injunction.

In accordance with that vote, a petition for injunction was filed on July 14, and a restraining order and temporary injunction was issued ex parte.

A few days later, on July 19, the Association held another meeting at which the law suit was discussed. The meeting agreed upon a list of items to be negotiated as follows:

"1. Submit written approval from the county zoning board that the house is approved for placement as a manufactured home. Submit a copy of the Building Permit to the Association.

2. Move and lower foundation to position acceptable to Home Owner's Association.

3. If foundation is not moved, cover all exposed foundation with fill dirt. Submit site plan for approval.

4. Brick or rock all exposed exterior walls (including foundation).

5. Change pitch of roof to conform to surrounding residences.

6. Reinstall hip on west side of home as pictured in Exhibit # 3 [trial Exhibit B].

7. Finish overhang over the front door as per exhibit # 3 [trial Exhibit B].

8. Landscape break on east, north, and west in or about building limit lines. Landscape and breaker plans to be submitted by nursery. Minimum planting height 10 feet and 30 feet at maturity.

9. The Homeowner's Association shall be reimbursed for any and all fees incurred for nonconformance to restrictions.

10. Written statement from lending association appraiser that manufac-

tured home will not adversely affect neighborhood over term of loan but not less than 20 years.

11. All agreements will be in writing and items herein will be filed in conjunction with the injunction.

12. Cash bond to assure compliance.

13. Negotiations to be complete by court date; if negotiations are not complete, remove section of home sitting on private property until negotiations are complete.

14. All alterations as agreed upon, to be submitted for approval by the Home Owner's Association and construction to be completed before the home can be occupied."

It was further agreed that these fourteen items would be submitted to the Association lawyer to be submitted by him to the defendants.

The fourteen points were then presented to the defendants on July 22. This was the first time that any specific objections to the plans had ever been given to defendants, and this was the first indication that there was anything that could be negotiated. The discussion at this meeting failed to produce any compromise agreement. On July 23 the Association's executive board held a further meeting in which they decided to make some slight modifications in the fourteen points, principally to eliminate point No. 2 and to require fill dirt within 12″ of the base of the house instead of requiring all of the exposed foundation to be covered. The record does not show whether or how this modified proposal was presented to defendants. In any event, no compromise was reached.

Evidence was received by the trial court on July 24 and 25, 1978. At the conclusion of the evidence the court remarked that some of the fourteen points are unreasonable and some of them were reasonable. The trial judge further stated: "I believe that when you people laid down those 14 you thought some of them were unreasonable, but you did it with negotiation in mind, being a humanbeing [sic], so, I'm going to use a little common sense and try to work this out . . . ."

Thereafter on August 2, 1978, the court entered judgment making the temporary restraining order and temporary injunction permanent, but further providing that the defendants would be permitted to construct the dwelling under the following conditions:

"A. That the defendants install and construct a dwelling house on Lot 8 in conformity with the floor plan shown on defendant's Exhibit 'B,' the drawings submitted by the defendants Baltrusaitis to the plaintiff Schott.

B. That the defendants install brick or stone on the South side (front) of said dwelling house as shown on defendant's Exhibit 'B.'

C. That the defendants grade soil around the house on the West, North and East sides to within twelve (12) inches of the top of the foundation.

D. That the defendants install the cedar trim around the windows on said home as shown on the architectural plans submitted by the defendants.

E. That the defendants construct above the front door on the South side of the house an overhang similar to the one shown on defendant's Exhibit 'B.'

F. That the defendants plant and maintain on the Northeast corner of Lot 8, five (5), seven-foot, fast-growing trees spaced twenty (20) feet apart and running West and South from the Northeast corner of said Lot 8.

G. That the defendants complete the above construction and installations within ninety (90) days."

Defendant's points on appeal, somewhat rearranged and summarized, are that the trial court erred in not dissolving the temporary injunction because: (1) defendants received valid authority from Schott to build the home in question; or (2) even if such authority was not given, nevertheless the refusal to authorize the plan submitted on July 2, 1978, was unreasonable.

## I.

There can be no doubt but that Schott, not the Home Owner's Association,

was the proper party to either approve or disapprove defendants' plans. Paragraph VII of the Declaration of Restrictions clearly reserves that right to "the parties" who were the Schotts and the Monteils. Schott had continued to exercise that authority alone after Monteil's retirement, and that fact was well known and accepted by everyone including Paris Realty.

Even though Schott may have intended to transfer the authority to the Home Owner's Association, he wholly failed to do so in the manner specified by paragraph XVI of the Declaration. That was expressly admitted in the minutes of the Home Owner's Association meetings of June 29 and July 10, and this was expressly recognized by the trial judge in his oral remarks at the close of the evidence.

■ Furthermore, it must be concluded that Schott did effectively approve the plan submitted to him on March 15 by Clevenger. His remarks as testified by Clevenger could not have been understood by her in any other light than as an approval of the plan. Although Schott testified that he did not intend to make an approval and that it was his practice to refer everybody to the Association for approval, he would not say that he had made such a reference in talking to Clevenger, nor did he deny having made the statements attributed to him by Clevenger.

■ It is true that the Declaration requires in terms that any approval be given in writing, and the trial court expressed the view that the lack of any writing by Schott rendered his approval ineffective. That, however, leaves out of account the long continued practice by which Schott had uniformly over the years given all necessary approvals informally in oral form, without any reduction to writing. That long continued unbroken practice, acknowledged by Schott himself and well known to Paris Realty, constituted a waiver and abandonment of the requirement that approvals be in written form. *Scharer v. Pantler,* 127 Mo.App. 433, 105 S.W. 668 (1907); *Gibbs v. Cass,* 431 S.W.2d 662 (Mo.App.1968); *Lake Saint Louis Community Association v. Kamper,* 503 S.W.2d 447 (Mo.App.1973).

■ Nevertheless, the foregoing consideration does not end the question of whether or not there was an effective approval of defendants' plans. What Schott approved was the plan shown by Exhibit B. Concededly, the plans submitted on July 2 and which were those actually intended to be used by defendants differed from the proposal shown by Exhibit B. A consideration of the variances persuades the conclusion that there was sufficient difference so that further submission and consent was required. The changes were not so fundamental in character that they constituted a complete departure from Exhibit B; but on the other hand, they were not in aggregate so trivial that they should be treated as de minimus. The approving authority had the right to see the proposed changes and give them reasonable consideration. That conclusion brings us to the crucial question of whether the refusal to approve the proposed changes was unreasonable.

## II.

■ The Missouri law is well settled, as the parties agree, that subdivision restrictions requiring approval of building plans are valid, but that such authority must be exercised reasonably. *LeBlanc v. Webster,* 483 S.W.2d 647 (Mo.App.1972). One of the factors bearing on reasonableness and to be taken into account is a public policy in favor of free, untrammeled use of real property. Id. See also *Weber v. Les Petite Academies,* 548 S.W.2d 847 (Mo.App.1976); *Gibbs v. Cass, supra; Scharer v. Pantler, supra.* And in determining whether refusal of approval is reasonable so as to warrant injunctive relief, "the right to such relief must be clear and the reason for such relief clearly established." *LeBlanc v. Webster, supra.* Whether the denial of approval in this case was reasonable is subject to review by this court, and the trial court's determination may be reversed if not supported by substantial evidence. *Murphy v. Carron,* 536 S.W.2d 30 (Mo. banc 1976).

■ Under all of the evidence, the refusal to approve defendants' plans was unrea-

sonable for a number of reasons. In the first place, defendants were entitled to have that determination made by one person, Schott. Instead, the Association undertook to make defendants run the gauntlet of 35 people. That substituted requirement was in and of itself unreasonable, for as the trial court itself remarked, "I'd hate to have 20 different people telling me, you know, how to put up a house."

■ A second reason why the refusal was unreasonable was that the Association refused until the eleventh hour to give any specific reason or reasons. When the Association finally did come up with a set of fourteen points, clearly, in the terms of the trial court "some of the things of the 14 are unreasonable." Even assuming that the Association may have had one or two reasonable objections, it should have specified them so that defendants might have a reasonable opportunity to accede and conform or negotiate some compromise.[2]

Third, and most fundamentally, peering through a camouflage of words, an impartial observer cannot avoid seeing that the real reason for the Association voting against defendants' plans was an underlying opposition to permitting any kind of a prefabricated home. Not only does this show through boldly in the testimony of Schott and Reed, but it is quite openly stated in the minutes of the Home Owner's Association meeting of July 10, which recites as part of the discussion that took place, "We can make cosmetic changes or keep out the manufactured home because it does not conform."

When this case got to court, the plaintiffs were unwilling to take a position opposing any and all "modular homes." Indeed, both Schott and Reed testified that if the defendants had built a home strictly in accordance with Exhibits B and G, they would have no objection. Rather, the position taken by those witnesses and that which was taken belatedly by the Association's adoption of the 14 points, has been to seize upon the variations from what is shown on those two exhibits in order to justify a refusal of approval. It remains only to show that these variances are not of such character and significance as to warrant the refusal of approval.

■ All fourteen points need not be discussed, because it is clear beyond debate that it was only Schott who had a right to make objections, and the objections stated by Schott in his testimony were much more limited. Schott's first objection was that the foundation was not deep enough, raised the house too high, and left portions of the foundation uncovered and exposed to view. For that reason, he stated that defendants' plans should have included brick work on the side and front to mask the exposed foundation, as was in fact proposed and shown in Exhibits B and G. The answer to this objection lies in the fact that a considerable number of houses in Green Acre Estates have similar exposed foundations. This fact is shown by photographic exhibits and was admitted by the Association witnesses. What has been considered reasonable for other lot owners in the subdivision cannot be unreasonable when proposed by defendants. As Schott himself admitted, the brick facing in question would be merely "gingerbreading" and of no real significance.

■ A second objection voiced by Schott had to do with the pitch of the roof. Here too the evidence shows that a number of other homes in the area have roofs of no greater pitch. Defendants' proposal therefore conformed to what already prevailed and must be considered reasonable.

■ Schott in his court testimony also made reference to the change from a hip roof to a gable roof. However, neither he nor any other witness explained satisfactorily why a gable roof was objectionable or why a hip roof would be preferable. Flood

---

2. This court was informed during the course of oral argument that defendant Flood did in fact complete the house in compliance with the conditions imposed by the trial court. His counsel added: "certainly building the house under those conditions was preferable to not building it at all, but we believe we were entitled to build the house as planned."

had advised plaintiffs that to require this change in style of roof would be prohibitively expensive. It is especially to be noted that the trial court did not require conversion to a hip roof as one of its conditions to building of the house. The evidence does not show the insistence upon a hip roof to be reasonable.

■ Schott mentioned also as an objection the elimination of an overhang over the front door. Photographic exhibits show other houses in the area have no such overhang. The evidence fails to show that an insistence upon this feature was reasonable.

■ Finally, Schott makes mention of the desirability of landscaping. It is to be observed that there is a fair amount of natural trees and shrubbery in the area and many of the homes are shown by photographic evidence not to have specially planted landscaping. No such special landscaping is shown in Exhibit G which Schott testified would be a completely acceptable home development.

In sum, the only party with authority to approve defendants' plans did so to the extent reflected in Exhibit B. The refusal to consent to the minor variances later proposed was unreasonable. The temporary and permanent injunction order should have been vacated after the hearing. The judgment entered August 2, 1978, making the injunction permanent is reversed, and upon appropriate motion the trial court shall determine damage, if any, against the injunction bond. *Weil v. Richardson*, 225 Mo.App. 1237, 35 S.W.2d 369 (1931).

All concur.