David W.B. MAROSE, Phyllis D. Marose and Harbor Heights Property Owners Association, Inc., Respondents,

v.

Lawrence M. DEVES and Nancy A. Deves, Appellants.

David W.B. MAROSE, Phyllis D. Marose and Harbor Heights Property Owners Association, Inc., Respondents,

v.

Lawrence M. DEVES, Nancy A. Deves and the Deves Group, Inc., Appellants.

Nos. 13812, 13810.

Missouri Court of Appeals, Southern District, Division Two.

July 30, 1985.

Application to Transfer Denied Oct. 16, 1985.

Connie J. Clark, Osage Beach, for appellants.

William Icenogle, Camdenton, respondents.

CROW, Judge.

The dispute in these consolidated appeals is whether the owners of four lots in a subdivision in which only single-family residences had previously been constructed may erect six two-family residences on the land comprising the four lots. The trial court said no. We agree.

The assignments of error are easier stated after a synopsis of the evidence. In recounting it, we accept as true the evidence and permissible inferences which may be drawn favorable to the prevailing party and disregard the contradictory testimony, *Mills v. Cameron Mutual Insurance Co.*, 674 S.W.2d 244, 246–47[2] (Mo. App.1984); *Lee v. Rolla Speedway, Inc.*, 668 S.W.2d 200, 205[3] (Mo.App.1984), being mindful that in this court-tried case the trial judge determined the credibility of the witnesses and was free to accept or reject all, part or none of the testimony, *Mills*, 674 S.W.2d at 246–47[1]; *Cusumano v. Outdoors Today, Inc.*, 608 S.W.2d 136, 139[4] (Mo.App.1980).

So viewed, the evidence establishes that in 1974, David W.B. Marose and Phyllis D. Marose, owners of a tract of land abutting the Lake of the Ozarks in Camden County, filed in the office of the Recorder of Deeds of that county a plat of the tract captioned "Amended Plat To HARBOR HEIGHTS ESTATES."

The plat subdivided the west portion of the tract into lots numbered 1 through 47. The subdivided portion is situated such that the south, west and north boundaries thereof are shoreline. Beginning at the southeast corner of the subdivided portion and running clockwise around the shoreline, lots 1 through 27 abut the Lake, lot 27 being the one at the northeast corner of the subdivided portion. Access to these lots is by a road that adjoins each on the side opposite the side touching the Lake. That is, the road parallels the shoreline, with lots 1 through 27 lying between the road and the Lake. Lots 28 through 47 are on the other side of the road. These lots were referred to at trial as "second-tier" lots, evidently because they, being on the opposite side of the road from the shoreline lots, do not adjoin the Lake.

The plat contained certain restrictions, including this:

"No building or other structure shall be commenced upon any one lot until the location and the complete plans and specifications have first been submitted and the same approved by the dedicators or assignee."

This restriction is henceforth referred to as "the building approval restriction."

About "the first week in August," 1983, Lawrence M. Deves, a real estate broker and builder, and his wife, Nancy, purchased lots 28, 29, 30 and 31, vacant second-tier lots across the road from lot 26, a shoreline lot on which was situated a single-family residence owned by the Deveses and in which they had lived for several years.

On Thursday, August 11, 1983, Marshall Shefferly, at the request of Lawrence Deves, delivered a "set of plans" to Darrell L. Foster, whose home was on lot 18. Foster described himself as a "member of the architectural committee for Harbor Heights." That three-member committee, according to Foster, had been chosen by the residents of Harbor Heights to determine whether plans for construction in the subdivision met its "standards."

Shefferly, a building contractor, was the person from whom the Deveses had purchased lots 28, 29 and 30. The party from whom they had acquired lot 31 is not disclosed. According to Shefferly, he was going to assist Lawrence Deves in the construction of four buildings on the four vacant lots. Shefferly knew Foster was a member of the architectural committee because Shefferly had previously built a home in Harbor Heights and had submitted the plans for that structure to Foster.

The plans delivered by Shefferly to Foster on August 11, 1983, could not be found at time of trial. Asked to describe them, Shefferly responded, "[P]robably a floor-plan of both levels and a front ... front view of the home." Asked whether the plans showed that the buildings would be "duplexes," or "consist of two family units with two kitchens," Shefferly answered: "No, the rooms are similar, but it didn't ah ... I don't believe they showed two kitchens."

Foster testified that the plans did not show that the buildings would be "duplexes." Foster recalled telling Shefferly that "they were looking at four houses, at four lots, and I would need to see plans for four houses." Foster also remembered saying that he could not see any way that the single floor plan and the single elevation could be approved.

Nothing in the documents delivered to Foster on August 11 showed where any of the proposed structures would be situated on the vacant lots, and there was nothing to indicate that more than four structures would be erected.

Foster understood from Shefferly that construction was to commence Saturday, August 13, 1983.

Lawrence Deves testified he was contacted on August 13 by Foster, who requested "better drawings about what the fronts were going to look like, and so forth."

In response to Foster's request, Deves had his son deliver a set of documents to Foster the same day (August 13). These documents (Exhibit 12) consisted of (a) certain specifications regarding materials to be used in construction and (b) drawings of the "front elevation" and "side elevation" of one building. Nothing in Exhibit 12 indicated that the structure was to be a two-family residence, nor was there anything showing where it was to be situated.

Foster testified he phoned Lawrence Deves on Monday morning, August 15, and stated that no plans had been approved and that he (Deves) should postpone construction until approval. Foster recalled telling Deves that the plans were unacceptable to him (Foster) and that the only way Deves could get approval was for the other two committee members, Jerry Yeamans and Bill Schierholz, to approve them. Foster explained that inasmuch as Yeamans and Schierholz were in Lebanon, Missouri, and St. Louis, respectively, there would be a delay of "roughly two weeks." Foster quoted Deves as saying, "I just can't afford the time."

Lawrence Deves testified that about a week later he sent Foster some pictures showing how the exteriors of the buildings would look when finished. These pictures (Exhibit E-1) consisted of three pages of colored drawings evidently torn from a magazine.

David Marose testified that some time between August 20 and 25, 1983, he was told by Foster that construction was under way on the four lots and "there was a problem with compliance, and he wished me to look into the situation." According to Marose, Foster showed him "a very crude, a single layout for one ah ... building, and a magazine, three pages out of a Homes magazine with circles around the houses ah ... indicating what we might assume these exterior ah ... the exteriors of these houses would look like." Marose understood that four houses were to be built. In his opinion, the blueprint did not look like the houses in the magazine drawings.

Marose testified:

"Q. Did these plans, as shown you, show the location of any of these buildings on the lots?

A. No, they did not.

Q. Did the plans which were shown you at that time indicate that there would be a duplex built there?

A. Quite the contrary, no.

Q. Did you approve these plans at that time?

A. No, we did not."

According to Marose, he directed an attorney to notify Lawrence Deves that legal action would be filed to enforce the "rules

and regulations" of the subdivision. Marose testified the attorney notified Deves of this on August 27, 1983.

Foster testified there was a "subdivision meeting" on Labor Day, September 5, 1983, and that those who attended voted to file suit. By this time, construction of the four buildings was proceeding apace.

On September 9, 1983, David Marose, Phyllis Marose, and Harbor Heights Property Owners Association, Inc., a not-for-profit corporation, hereafter referred to collectively as "plaintiffs," filed a petition against Lawrence Deves and Nancy Deves in the Circuit Court of Camden County. This action, from which appeal number 13812 arises, is hereafter referred to as "the first case."

The petition quoted the building approval restriction and alleged, *inter alia*, that the Deveses had taken possession of lots 28, 29 and 30 and had commenced construction thereon without submitting plans and specifications or seeking approval of said construction or its location. The petition sought a temporary restraining order, a preliminary injunction, and a permanent injunction prohibiting the Deveses from constructing any structures in Harbor Heights until the location, plans and specifications therefor had been approved by the dedicators of Harbor Heights or their assigns.

On September 14, 1983, the parties appeared before an associate circuit judge on the request for a temporary restraining order. No record of that hearing is before us, but the docket sheet shows:

"Evidence heard. Court finds that damages is sufficient remedy & that no showing of irreparable harm was made. Therefore, TRO denied."

The Deveses' attorney thereafter sent a letter to plaintiffs' attorney. The letter (Exhibit A) is dated September 16, 1983, but bears a handwritten notation: "Hand delivered 9/28/83." Exhibit A says, in pertinent part:

"In regard to our conversation after the conclusion of the proceedings in Court, enclosed you will find an updated set of plans which specify the exact dimensions and specifications for the four units that Mr. Deves is constructing on Lots 28, 29, 30 and 31 in Harbor Heights Subdivision.

"The last page of these plans shows a plain drawing of the exterior. Mr. Deves indicates that the exterior portions of the buildings will be trimmed out as specified in the front elevations that he has already submitted to you.[1]

"In addition, the three specification sheets in regard to the size and quality of materials that has been submitted to Harbor Heights Subdivision[2] is the specifications that is presently being used for the construction of these buildings.

"If there are any other materials or questions that the Association has in regard to the plans for Mr. Deves' construction, please advise so that we may submit this information to them as quickly as possible."

The plans and specifications that accompanied Exhibit A were admitted in evidence at trial as Exhibit 8.

Exhibit 8, according to David Marose, was received by him about September 30, 1983. Exhibit 8, consisting of three pages, is a set of plans for a two-level structure. The floor plan for the upper level shows a living room, a "dining-kitchen," two bedrooms and a bath. The floor plan for the lower level shows a living room, a "dining-kitchen," one bedroom and a bath. Exhibit 8 also contains drawings of the front, rear and side elevations. Only one outside door is shown on the front of the structure; however, an entryway immediately inside has (1) a stairway leading to a door to the upper level and (2) a hallway leading to a door to the lower level. It is evident that each level is an independent residential unit. Although four structures were to be erected, Exhibit 8 shows only one floor plan and one exterior. The plans bear the

---

1. Evidently the magazine drawings sent to Foster about August 20, 1983 (Exhibit E–1).

2. Evidently the specification sheets delivered to Foster August 13, 1983 (Exhibit 12).

following notations: "Date 8/31/83" and "Revised 9-2-83."

Plaintiffs' attorney sent the Deveses' attorney a letter dated October 14, 1983. That letter (Exhibit B) said, in pertinent part:

"Please be advised that I did forward the proposed building plans [3] submitted by you to me on to Mr. David Marose for his approval.

"Mr. Marose met with the Harbor Heights Property Owners Association's Architectural Committee and please take this letter as a response by both Mr. and Mrs. Marose and the Architectural Committee for the Harbor Heights Property Owners Association to the submission of the plans by Mr. Deves.

"The plans submitted by Mr. Deves are totally unacceptable in that the houses are not in conformity with the square footage regulations for lots of the size and nature that Mr. Deves is building upon.

"In addition please be advised that the exterior appearance of the houses is unacceptable. They simply do not conform with the quality of the surrounding neighborhood and quite frankly it is the opinion of Mr. and Mrs. Marose and the Architectural Committee that the appearances of the structures alone would cause a tremendous detriment to the surrounding property values. Either additional roof lines and/or additional construction will be necessary by Mr. Deves in order to satisfy the Architectural Committee and Mr. and Mrs. Marose.

"In addition it is my understanding that Mr. Deves intends to use these structures as some sort of multi-family housing. There is a considerable amount of concern on the part of the property owners within Harbor Heights Estates as to whether or not the existing well and well system can support multi-family housing in the location that Mr. Deves has built.

"I think it best for Mr. Deves to meet with Mr. Marose and the Architectural Committee as quickly as possible. I suspect that if there was an open dialog between our respective clients, a mutually satisfactory arrangement can be made.

"Of course if it is not Mr. Deves' desire to meet with the Architectural Committee, I will be happy to forward to them any proposal submitted by either you for Mr. Deves or from Mr. Deves himself. I must reiterate that it will be necessary to change the exterior appearances of the houses at a very minimum before the Architectural Committee and Mr. and Mrs. Marose will give their approval."

The Deveses' attorney sent plaintiffs' attorney a letter dated October 28, 1983. That letter (Exhibit C) said, in pertinent part:

"In regard to your letter of October 14, 1983 enclosed is some information you have requested in regard to Mr. Deves' construction.

"As to the exterior portions of the building, here is a summary of the completion plans of Mr. Deves:

"Building Four—Mr. Deves believes he submitted to the committee an outside sketch of Building Four showing rock trim, etc. This building will be finished as submitted to the committee with stuccato board; trim in dark brown rough cedar; dark brown stone under the cantilever section; dark brown stain around the rest of the exterior.

"Building Three A gable roof over front door section; grey rock under the cantilever section; diagonal carsiding or equivalent above and around the door; exterior color probably blue transparent stain;

"Building Two Full lenth [sic] roof along front between levels; brown stone on lower full length; with horizontal lap-siding; medium brown exterior.

---

**3.** Evidently Exhibit 8.

"Buildong [sic] One Gable roof over front door; light brown stone under cantilever section; natural color on rest of siding; diagonal siding on front.

"In regard to the square footage complaint of the committee, we do not feel there has been any square footage violation in light of the restrictions that appear on the Plat of Harbor Heights. ... Mr. Deves' homes have 832 square feet on upper level; 800 square feet on lower level; for a total of 1632 square feet.

"In regard to the question on water, please be advised that the units have only three bedrooms, which is a similar density to the homes that are built in Harbor Heights Subdivision.

"Please advise if any additional information is requested by the Harbor Heights Property Owners Association."

On January 24, 1984, while the first case was awaiting trial, Foster was advised by phone by a homeowner in Harbor Heights that a building permit had been issued to Lawrence Deves for two additional buildings.

Foster and David Marose each received a copy of a letter to Deves from the Mayor of the City of Osage Beach dated January 25, 1984. The letter told Deves that two building permits had been "reinstated" on the basis of three conditions specified in the letter. Attached to the letter was a diagram showing new property lines across lots 28 through 31. These lines ostensibly converted those four lots into six, designated A through F.

Lots 28 through 31 lie side by side, their north boundaries abutting the road. Lot 28 is the easternmost lot. According to the diagram, newly designated lot A is approximately the east two-thirds of lot 28. One of the four structures commenced in 1983 is shown on newly designated lot A. Newly designated lot B is composed of the remainder of lot 28 and the east part of lot 29. One of the two proposed new structures is shown on newly designated lot B.

Proceeding westerly from newly designated lot B, lots C, D, E and F are created

from the remainder of lot 29 and lots 30 and 31. The other three structures commenced in 1983 are shown on newly designated lots C, D and F, respectively. The other proposed new structure is shown on newly designated lot E.

Interestingly, however, the four structures commenced in 1983 are situated such that each lies entirely within the boundaries of an originally platted lot. That is, the easternmost 1983 structure sits entirely on lot 28 as originally platted, and the other three 1983 structures sit, respectively, on lots 29, 30 and 31. Not one of the 1983 structures, however, sits in the middle of an originally platted lot. Instead, each is situated nearer one side or the other, thereby affording sufficient empty space for new lots B and E where the two new structures were diagrammed.

David Marose testified that prior to January 25, 1984, he had no idea that two new buildings were going to be built. He had been furnished no blueprints for these structures and no site plan indicating where they would be located.

Plaintiffs immediately (January 25, 1984) filed a petition for injunctive relief against the Deveses, alleging the Deveses had failed to submit plans and specifications for said structures and that the building approval restriction forbade construction without approval of the location and plans by the dedicators of Harbor Heights or their assignee. Plaintiffs sought a temporary restraining order, a preliminary injunction, and a permanent injunction prohibiting the Deveses from commencing and continuing construction of the two new structures until approval thereof. This suit, from which appeal number 13810 arises, is hereafter referred to as "the second case."

At the time the second case was filed, excavation had been completed for the two new buildings and the footings had been poured.

On January 28, 1984, Lawrence Deves had a set of documents (Exhibit 11) delivered to David Marose. Exhibit 11 consists

of a "set of blueprints" showing a two-level structure similar to the four 1983 buildings, i.e., a one-bedroom residential unit on the lower level and a two-bedroom residential unit on the upper level, and some photographs showing a residence, the exterior of which is constructed of logs.

On January 31, 1984, plaintiffs were granted leave to add The Deves Group, Inc., as a defendant in the second case. All parties to the second case appeared in court by counsel that date (January 31) and a temporary restraining order was entered. That order is not before us; however, it evidently prohibited further construction of the two new buildings, as Lawrence Deves testified he "ceased everything" after the order was entered.

The same day the order was entered, David and Phyllis Marose sent a letter (Exhibit 10) to the Deveses and The Deves Group, Inc. The text of Exhibit 10 follows, in its entirety:

"The plans you submitted to us for location and construction of two buildings on part of Lots 28 and 29 and part of Lots 30 and 31, Harbor Heights have been reviewed by us and the Harbor Heights Owners Architectural Committee. This will advise you that these plans are unsatisfactory and cannot be approved for the following reasons:

"1. The site plan as submitted provides for construction of the buildings over platted lot lines.

"2. Upon completion of these two proposed buildings, there would be six buildings located on four platted lots.

"3. You propose a log type construction and exterior, which cannot be approved in that this construction and exterior design is completely out of harmony with the existing residences and buildings in Harbor Heights.

"4. Your plans provide for two separate living or family units in each building, which cannot be approved in that all other buildings in Harbor Heights are single family units.

"5. The site plan provides for a retaining wall eight feet high at the front of these buildings and located on the edge of the public street. We consider such a wall unsightly and an impediment to the free flow of automobile traffic."

The first case and the second case were consolidated for trial, which took place March 14, 1984.

The evidence, in addition to that already synopsized, showed that 32 single-family residences had been constructed in Harbor Heights. No single originally platted lot was occupied by more than one single-family residence, and in a few instances one lot and part of another had been combined as the site for one single-family residence. Consequently, the density of the single-family residences was less than one residence per one originally platted lot.

The residential character of the subdivision was spelled out by the following restrictions on the plat:

"All lots are for residential purposes only unless approved in writing by the dedicators or assignee.

"No tent, shack, trailer or outbuilding shall at any time be used as a residence either temporarily or permanently."

The only structures in Harbor Heights other than the 32 single-family residences were the four 1983 two-family residences situated, respectively, on newly designated lots A, C, D and F.

Lawrence Deves testified that newly designated lot A had been sold to his brother, John Deves, between November 1 and 10, 1983, for $50,000. Lawrence Deves further testified that newly designated lot F had been sold to his aunt, Kathleen Stewart, for $60,000. Asked whether anything remained unfinished on the buildings on those lots, Lawrence Deves responded, "There's some exterior work, rockwork, and ah ... the biggest part of it being landscaping and parking areas." Deves added that he intended to complete those items.

Of the aggregate eight residential units in the four 1983 buildings, seven, according to Deves, were occupied by renters at time

of trial. The two-bedroom units rent for $325 per month, the one-bedroom units for $225 per month.

Lawrence Deves disclosed that newly designated lots B and E, the proposed sites for the two additional structures, had been sold to a corporation. Asked who owned the stock, Deves replied, "Myself and another partner." [4]

No documents substantiating any of the transfers of ownership testified to by Lawrence Deves were produced at trial. Plaintiffs' petition in the second case alleged that the "Defendants" (presumably Lawrence Deves, Nancy Deves and The Deves Group, Inc.) are the owners and occupants of lots 28, 29, 30 and 31. In an answer filed February 14, 1984, a month before trial, Lawrence Deves, Nancy Deves and The Deves Group, Inc., admitted that allegation.

The trial court entered judgment in the first case providing, in pertinent part:

"... Defendants are hereby ordered and directed to make such changes as are necessary to convert the four buildings, which they now have under construction or are completed, to single family dwellings; that prior to commencing such alterations Defendants are ordered and directed to submit their plans for such conversion to Plaintiffs Marose and the Subdivision Architectural Committee for their approval to convert all four existing buildings to single family homes; Defendants are restrained and enjoined from maintaining said four buildings as two-family or multi-family dwellings.

"Defendants are further ordered to complete the exterior of the four homes and grounds as approved by Plaintiff David W.B. Marose.

"Defendant Lawrence M. Deves is ordered to get the above-referred to plans approved by Plaintiff and the Architectural Committee, and the work to change each structure to a single-family dwell-

ing, within ninety (90) days, or failing to do so to show cause to this Court why Defendant Lawrence Deves should not be held in contempt."

The trial court entered judgment in the second case providing, in pertinent part:

"... Defendants are hereby restrained and enjoined from proceeding with any construction on the two buildings now under construction; that Defendants shall, within Forty Five (45) days, remove the footings, foundations and concrete walls, fill and grade the excavations and thereafter reseed the same ...."

Upon the filing of a supersedeas bond by Lawrence Deves and Nancy Deves in the first case, and the filing of a supersedeas bond by Lawrence Deves, Nancy Deves and The Deves Group, Inc., in the second case, execution of the judgments was stayed pending these appeals.

Although The Deves Group, Inc., was evidently never made a party to the first case, counsel for the Deveses and The Deves Group, Inc., in filing a single brief on behalf of those three parties in these consolidated appeals, refers to them collectively as "Appellants," without differentiating between them in the first case and the second case. We henceforth employ the same appellation.

Appellants' first point, verbatim, is:

"The trial court erred in its decision that the appellants' property in Harbor Heights subdivision cannot be used for multi family purposes, in that no such restriction is specifically stated in the recorded restrictions of this subdivision, nor is such restriction implied by law."

The point misstates the trial court's ruling. The trial court did not hold that appellants could not use their land for multi-family purposes. What the trial court did hold was that appellants would have to modify the *four buildings* situated, respectively, on newly designated lots A, C, D and F so that each would be a single-family dwell-

---

4. Appellants' brief identifies the corporation as The Deves Group, Inc., and Lawrence Deves and John Deves as "principal shareholders."

ing, and that appellants could not maintain *those buildings* as two-family or multi-family dwellings. As to the two buildings that had been started on newly designated lots B and E, respectively, the trial court enjoined appellants from proceeding with construction of *those buildings* and ordered appellants to remove the footings, foundations and concrete walls and to restore the grade of the land and reseed it.

The trial court did not have to decide whether *all* possible uses of appellants' land for multi-family residential purposes, absent approval by the Maroses or their assignee, could be enjoined. The trial court was presented with a specific fact situation in which four two-family residential structures were virtually completed and two others had been started. The floor plan of the four completed structures was before the trial court as part of Exhibit 8, along with photographs of the exteriors of those structures. All had been built without approval of the plans and specifications or site locations, in violation of the building approval restriction. The floor plan and drawings illustrating the exterior appearance of the two proposed structures were also before the trial court (Exhibit 11), and appellants had commenced construction of those buildings without approval of the plans and specifications or site locations, again ignoring the building approval restriction.

The trial court was not dealing with a situation where appellants' land stood vacant. Whether the Maroses or their assignee, by withholding approval under the building approval restriction, could have lawfully prevented appellants from constructing *any* multi-family residential buildings on their land—had it still been vacant—was not a question the trial court had to decide, nor do we.

Having said this, we turn to the Missouri cases that have dealt with restrictions similar to the one here.

In *LeBlanc v. Webster*, 483 S.W.2d 647 (Mo.App.1972), a residential subdivision restriction prohibited construction or alteration of any structure until a complete set of plans and specifications therefor had been approved in writing by an architect or agent appointed by the developers. The restriction gave the architect or agent the right to disapprove the plans and specifications if in his opinion the proposed building was not in harmony with the general surroundings of the site where it was to be erected or with the adjacent buildings or structures. Construction of a house was opposed by the developers because the proposed site plan showed a driveway which, in their opinion, was unsightly and out of harmony with the surroundings because of excess fill.

*LeBlanc*, after examining cases from other jurisdictions, concluded that the majority rule is that a restriction requiring prior approval or consent to the erection of structures is valid but that the authority to approve or reject must be reasonably exercised. 483 S.W.2d at 650[1]. *LeBlanc* added:

> "We also conclude from the reasoning of the cases discussed that the reasonable exercise of a requirement of prior consent includes situations when there is a lack of compliance with the specific restrictions of the subdivision; second, *when the proposed building is not consistent and harmonious with the overall plan or actual construction within the subdivision* or development *or when the proposed building is in conflict (creating damages) with the neighboring properties.* We believe that these criteria, although perhaps not the only ones that could be considered, are sound." *Id.* at 650[2]. (Emphasis added.)

The evidence in *LeBlanc* showed that many homes in the subdivision had fills and retaining walls to permit construction on the rolling terrain. Additionally, the dispute was only whether the fill for the driveway for the structure in issue should be on the north, as the plans showed, or on the south, as insisted on by the developers. After an extensive review of the evidence, *LeBlanc* concluded that the developers' re-

fusal to approve the fill on the north was not reasonable. *Id.* at 652[3].

*Melson v. Guilfoy,* 595 S.W.2d 404 (Mo. App.1980), involved a subdivision restriction prohibiting erection of a fence anywhere on any lot without written approval by the subdivision trustees. The owners of a residence in the subdivision wanted to erect a fence, but the trustees denied the request. The trial court upheld the restriction, rejecting a contention that it was unenforceable in failing to contain an "external standard" to guide the trustees in their exercise of the right of prior approval. In affirming the judgment, *Melson* cited *LeBlanc* for the proposition that no external standards are necessary with respect to restrictions requiring prior approval of subdivision construction where the discretion to grant or withhold is reasonably exercised. *Melson,* 595 S.W.2d at 407[4].

In *Ashelford v. Baltrusaitis,* 600 S.W.2d 581 (Mo.App.1980), a residential subdivision had a restriction similar to the building approval restriction in Harbor Heights. The litigation in *Ashelford* arose from the refusal to allow a single-family house of modular construction to be erected in the subdivision. *Ashelford* cites *LeBlanc* for the proposition that in Missouri, subdivision restrictions requiring approval of building plans are valid, but such authority must be exercised reasonably. *Ashelford,* 600 S.W.2d at 587.

■ We are persuaded by *LeBlanc, Melson* and *Ashelford* that the building approval restriction in Harbor Heights is valid and enforceable, and that the pivotal issue is whether the power to approve or reject the buildings in dispute here was reasonably exercised.

■ One of the factors bearing on reasonableness and to be taken into account is a public policy in favor of free, untrammeled use of real property. *Ashelford,* 600 S.W.2d at 587. However, the right of one property owner to the protection of a restrictive covenant is a property right just as inviolable as is the right of another to the free and untrammeled use of his property when unrestricted, and the courts are not commissioned to hunt out a way to defeat such a covenant. *Proetz v. Central Dist. of Christian & Missionary Alliance,* 191 S.W.2d 273, 277[2] (Mo.App.1945).

■ In the instant case, there was sufficient evidence to support a finding that the four buildings constructed by appellants and the two buildings they seek to construct are not consistent and in harmony with the actual construction in Harbor Heights. *See: LeBlanc,* 483 S.W.2d at 650[2]. As already noted, except for appellants' buildings, the only structures in Harbor Heights are 32 single-family residences which are so situated that their density is less than one residence per originally platted lot. Obviously, six structures that would accommodate 12 families on a total of four originally platted lots would create a density more than three times that of the existing development.

Additionally, while we profess no expertise in architecture or design, the photographs in evidence—showing every structure in Harbor Heights—support a finding that appellants' four completed buildings and two proposed buildings do not harmonize aesthetically with the overall development of Harbor Heights. While some of the single-family residences may be smaller than appellants' buildings, a substantial majority of the single-family residences appear to be larger, and a few can be characterized as lavish.

Furthermore, the design, style, exterior appearance and size of the single-family residences is varied, while appellants' four completed structures are built from the same plan inside and out. Only minor cosmetic differences on their exteriors prevent them from being quadruplets. Consequently, unlike the rest of Harbor Heights, lots 28, 29, 30 and 31 have four similar structures in a row.

Appellants' two proposed additional structures would be the only ones in Harbor Heights with exteriors of log construction. Their floor plans are virtual clones of appellants' four existing structures.

The considerations just discussed were some, but not all, of the reasons that impelled David Marose and the architectural committee to refuse to approve appellants' buildings. In Exhibit B, the letter of October 14, 1983, plaintiffs expressed their concern whether the well and well system could support multi-family housing in the location where the four buildings were situated. At trial, David Marose expressed the same concern.

The evidence further showed that at time of trial, the City of Osage Beach was proposing to zone Harbor Heights as "R–1–A," single-family dwellings. James Newman, a real estate broker in Osage Beach, expressed the opinion that "multi-family units" in Harbor Heights would have a "detrimental effect" on the value of the single-family units. *See: LeBlanc*, 483 S.W.2d at 650[2].

It is noteworthy that the Deveses had resided in Harbor Heights for several years and were presumably familiar with how the subdivision had developed. The trial court observed that when Lawrence Deves commenced construction, he was not building in an undeveloped area, but rather in one about two-thirds completed.

Our review of the trial court's judgment is governed by *Murphy v. Carron*, 536 S.W.2d 30, 32[1] (Mo. banc 1976). The judgment will be sustained unless there is no substantial evidence to support it, unless it is against the weight of the evidence, unless it erroneously declares the law, or unless it erroneously applies the law.

Emphasizing that the issue the trial court had to decide was whether, in refusing to approve appellants' buildings, the Maroses and the architectural committee reasonably exercised the authority conferred by the building approval restriction, we cannot convict the trial court of error in either of the two cases. In our view, the evidence heretofore discussed amply supports a finding that the refusal to approve appellants' buildings was reasonable.

Appellants, relying on *Ashelford*, 600 S.W.2d 581, argue that the refusal to approve their buildings was unreasonable in that they (appellants) were required to submit their plans to an architectural committee, then to David Marose, and finally to a "subdivision meeting of all the lot owners." Appellants say they were thus subjected to a "gauntlet" of "roadblocks" similar to that condemned in *Ashelford*.

We disagree. First, we point out that the documents initially supplied by Lawrence Deves to Foster did not reveal that Deves intended to erect any two-family residential structures on the vacant lots. Only when Exhibit 8 was received by David Marose at the end of September, 1983, was the true nature of the construction disclosed. By that time, work had been under way at least a month. Even then, the locations of the four structures were not shown. Consequently, there was no indication that the four structures were so situated that vacant space would remain for two additional structures. Thus, appellants never furnished all the data required by the building approval restriction.

Second, the Labor Day, 1983, meeting of the Harbor Heights property owners was not for the purpose of allowing each one to participate in compiling a list of objections to appellants' four buildings. The purpose was merely to see whether, based on the meager information then on hand, the property owners wanted to file suit to enforce the building approval restriction.

Third, appellants were not receiving conflicting signals from the architectural committee and the Maroses. From the outset, Foster made it clear that there had been no approval of appellants' project. Foster warned Lawrence Deves the day construction was scheduled to begin that he (Deves) should delay construction until such time as he received approval. Lawrence Deves spurned that advice. Once the true nature of Lawrence Deves' intentions became known (by Exhibit 8), the Maroses and the architectural committee spoke with one voice, as shown by the petition in the first case, Exhibit B (the letter of October 14, 1983), the petition in the second case, and Exhibit 10 (the letter of January 31, 1984).

Fourth, the trial court in the instant case made these findings, among others:

"... [Lawrence Deves] willfully and intentionally attempted to conceal from this architectural committee that he was intending to build duplex units. It is apparent to the court from the chain of evidence presented that he was merely attempting to present what minimal amounts of drawings, plats, pictures, that he could get by with to get the approval of this architectural committee. The pictures .. when asked for pictures, are obviously torn out of a book, and it's further obvious from looking at the pictures that the three that are completed and have all the siding on them don't come close to comparing with the pictures which he tried to represent was going to show what these buildings were going to look like when completed. He just continued to feed to the architectural committee what little evidence that he thought he had to, and then began announcing to them that he didn't have time to wait to go back and give them any more. He charged on with his construction."

The evidence fully supports these findings.

We need not, in this opinion, capsulize the facts of *Ashelford*. It suffices to say that the circumstances enumerated above show that appellants here were not run through an *Ashelford* gauntlet.

Appellants rely on *Weber v. Les Petite Academies*, 548 S.W.2d 847 (Mo.App.1976), for the proposition that restrictions on construction do not create restrictions on use. *Weber*, however, did not involve a building approval restriction like the one in Harbor Heights. Reiterating that the pivotal issue here is whether the refusal to approve appellants' buildings was reasonable, we find *Weber* inapplicable.

Appellants' first point is denied.

Appellants' second point, verbatim, is:

"The trial court erred in its decision that appellants' property in Harbor Heights subdivision cannot be resubdivided in that no such restriction is specifically stated in the recorded restrictions of the subdivision, nor is such restriction implied by mere lot lines on the plat of the subdivision."

This point, like the first one, misstates the trial court's ruling. Neither judgment said anything about subdividing lots 28 through 31 into newly designated lots A through F. The trial court simply prohibited appellants from erecting the two buildings proposed, respectively, for newly designated lots B and E, and ordered the footings, foundations and concrete walls for those structures removed.

That ruling was made at a time when the four buildings commenced in 1983 were virtually completed. Each of originally platted lots 28 through 31 had one of the 1983 buildings situated on it. All the trial court had to decide in the second case was whether, in such circumstances, the refusal of the Maroses and the architectural committee to approve the plans and specifications and the proposed locations of the two additional two-family residential structures was reasonable. The criteria for determining that issue in the factual context of this controversy have been discussed in considering appellants' first point. For the reasons expressed in denying that point, we hold that the trial court did not err in prohibiting appellants from constructing the two buildings proposed for newly designated lots B and E.

*Zinn v. Sidler*, 268 Mo. 680, 187 S.W. 1172 (1916), and *Bernard v. Winkley*, 130 S.W.2d 196 (Mo.App.1939), cited by appellants in support of their second point, are inapposite. The issue in those cases was whether a designated "building line" across the lots on a plat, absent any mention of the line in any other recorded instrument, created a restriction prohibiting construction between the line and streets adjacent to the lots. No such issue is presented here.

Appellants also rely on *Levin v. Mountain Farms, Inc.*, 22 Conn.Supp. 14, 158 A.2d 493 (Super.Ct.1959), in support of their second point. There, one lot was divided into two, and the owners of one of

the newly created lots wanted to erect a home thereon. Approval was withheld because the owners did not own the other newly created lot. There was no contention that the size or design of the home was inharmonious with the other homes or that its presence would adversely affect the density of the development, nor was there any assertion that it would diminish the value of the neighboring properties. *Levin* did not, therefore, involve the issues present here.

Appellants also argue that they had obtained approval from the City of Osage Beach to subdivide lots 28 through 31 into newly designated lots A through F. This assertion is based on the testimony of Lawrence Deves; however, he produced no documents evidencing such permission. In rebuttal, plaintiffs presented the testimony of a Commissioner on the Planning and Zoning Commission of Osage Beach, who testified that so far as he knew, Lawrence Deves had never applied for or received a permit to subdivide lots 28 through 31. The Commissioner added that he and the City Clerk had examined the minutes of the Planning and Zoning Commission and had found nothing showing that such a permit was ever issued.

■ The trial court made no finding whether the City of Osage Beach had approved the subdivision of lots 28 through 31. All fact issues upon which no specific findings are made shall be considered as having been found in accordance with the result reached. Rule 73.01(a)(2), Missouri Rules of Civil Procedure (15th ed. 1984); *Mills*, 674 S.W.2d at 249[3]. Consequently, we assume that no such permission was given. However, even if it had been, appellants fail to explain how that would have compelled the Maroses and the architectural committee to approve the two two-family structures proposed, respectively, for newly designated lots B and E.

Appellants' second point is without merit.

Appellants' final point, verbatim, is:

"The trial court erred in entering its injunctive order to appellants to stop using their property in Harbor Heights subdivision for multi-family purposes and from resubdividing their property in that:

A) The trial court failed to balance the benefit to respondents against the detriment to appellants of the trial court's order;

B) The trial court's order is not specific and definite in the acts that appellants are ordered to perform;

C) The injunction order required action by the appellants on property owned by persons not parties to this case, directly violating Missouri Supreme Court Rule 92.02(d) and making appellants' compliance with such an order an impossibility."

■ With respect to element "A," appellants argue there was no evidence that the other property owners in Harbor Heights would be damaged by appellants' intended construction. This assertion ignores the testimony of James Newman that the presence of multi-family units in Harbor Heights would have a detrimental effect on the value of the single-family dwellings. As to the "balance" between benefit and detriment, David Marose, who had 18 years experience in residential construction, testified that appellants' four 1983 structures could be converted to single-family dwellings for a cost not exceeding $1,000 each. We find element "A" of appellants' final point unpersuasive.

■ Regarding element "C" of their final point, appellants argue that the judgment in the first case orders them to perform alterations on real property they do not own, i.e., newly designated lots A and F. As noted earlier, Lawrence Deves testified that lot A had been sold to his brother, John Deves, between November 1 and 10, 1983. John Deves testified to the same effect. However, no document evidencing that sale was produced in evidence, and the trial court was not required to believe the

testimony of the Deves brothers. Furthermore, appellants' answer in the second case, filed 3 months after the purported sale, admitted that appellants owned and occupied lots 28 through 31 (*a fortiori*, newly designated lots A through F).

■ Facts admitted in a pleading have the same force and effect as facts found and are conclusive on the pleader. *Morrison v. Painter,* 170 S.W.2d 965, 971[15] (Mo.App.1943). Appellants cannot contend here that someone other than them owns newly designated Lot A.

Lawrence Deves also testified that newly designated lot F had been sold to Kathleen Stewart, but he did not reveal the date of that purported sale, and no document substantiating it was presented in evidence. Kathleen Stewart did not testify. What we have said regarding the alleged sale to John Deves applies equally to the alleged sale to Kathleen Stewart.

If either John Deves or Kathleen Stewart has any defense to the changes ordered by the judgment in the first case regarding lot A or lot F, he or she can raise it in a proceeding to which he or she is a party. Appellants cannot successfully attack the judgment in the first case by contending here that they do not own the land affected thereby. Element "C" of appellants' final point is without merit.

■ In regard to element "B" of their final point, appellants complain that the judgment in the first case commands them to obtain approval of the plans for converting the four existing buildings to single-family homes from the Maroses *and* from the architectural committee, but that the exteriors of those structures and the grounds are to be completed as approved by David Marose alone. This, says appellants, creates "uncertainty as to who is in charge."

We agree that the judgment in the first case should be consistent with respect to who has approval authority. The building approval restriction, as noted earlier, requires approval of the location, plans and specifications for all structures in Harbor Heights by the dedicators or their assignee. David Marose testified that the authority to approve new construction had never been "legally" transferred to anyone else and that he had the ultimate authority to accept or reject all proposed construction. Consequently, the judgment in the first case should be modified to provide that all approvals be by David Marose and Phyllis Marose until such time, if any, as they, by an instrument effective for such purpose, assign the approval authority to another. The Maroses may, of course, consult the architectural committee or anyone else they choose regarding the work to be performed by the Deveses under the judgment in the first case, but the authority to approve or reject shall be vested in the Maroses only, unless they assign such authority as mentioned above.

Except as provided in the preceding paragraph, the judgment in the first case is affirmed. The provision in said judgment designating the persons who are to approve the tasks to be performed by the Deveses is reversed and the cause is remanded with directions that the trial court amend the judgment in accordance with the instructions in the preceding paragraph.

The judgment in the second case is affirmed.

PREWITT, C.J., HOGAN, P.J., and MAUS, J., concur.